# HARRISON, ATTORNEY GENERAL OF VIRGINIA, ET AL. *v.* NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ET AL.

No. 127.  Argued March 23–24, 1959.—Decided June 8, 1959.

*David J. Mays* and *J. Segar Gravatt* argued the cause for appellants. With them on the brief were *Henry T. Wickham* and *Clarence F. Hicks.*

*Thurgood Marshall* argued the cause for appellees. With him on the brief were *Robert L. Carter, Oliver W. Hill, Spottswood W. Robinson III, William T. Coleman, Jr., Jack Greenberg, Constance Baker Motley* and *Louis H. Pollak.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

In this case a three-judge District Court was convened pursuant to 28 U. S. C. § 2281 to hear federal constitutional challenges against five Virginia statutes. It declared three invalid under the Fourteenth Amendment, and permanently enjoined the appellants from enforcing them against the appellees; the other two statutes it found vague and ambiguous and accordingly retained jurisdiction pending a construction by the state courts. 159 F. Supp. 503. Only the former disposition was appealed. The appeal raises two questions: First, whether in the circumstances of this case the District Court should have abstained from a constitutional adjudication, retaining the cause while the parties, through appropriate proceedings, afforded the Virginia courts an opportunity to construe the three statutes in light of state and federal constitutional requirements. Second, if such an absten-

tion was not called for, whether the District Court's constitutional holdings were correct. Because of our views upon the first question we do not reach the second.

National Association for the Advancement of Colored People (NAACP) and NAACP Legal Defense and Educational Fund, Incorporated (Fund), appellees herein, are organizations engaged in furthering the rights of colored citizens. Both are membership corporations organized under the laws of New York, and have registered under the laws of Virginia as foreign corporations doing business within the State. NAACP's principal relevant activities in Virginia are appearing before legislative bodies and commissions in support of, or opposition to, measures affecting the status of the Negro race within the State, and furnishing assistance to Negroes concerned in litigation involving their constitutional rights. Fund performs functions similar to those of NAACP in the field of litigation, but is precluded by its charter from attempting to influence legislation. The revenues of NAACP are derived both from membership dues and general contributions, those of Fund entirely from contributions.

NAACP and Fund brought this action against the Attorney General of Virginia and a number of other Commonwealth officials, appellants herein, for declaratory and injunctive relief with respect to Chapters 31, 32, 33, 35 and 36 of the Acts of the Virginia Assembly, passed in 1956. 4 Va. Code, 1958 Supp., §§ 18–349.9 to 18–349.37; 7 Va. Code, 1958, §§ 54–74, 54–78, 54–79. The complaint, alleging irreparable injury on account of these enactments, sought a declaration that each infringed rights assured under the Fourteenth Amendment and an injunction against its enforcement. Jurisdiction was predicated upon the civil rights statutes, 42 U. S. C. §§ 1981, 1983, 28 U. S. C. § 1343, diversity of citizenship; 28 U. S. C. § 1332, and the presence of a federal question, 28 U. S. C. § 1331.

The Attorney General and his codefendants moved to dismiss the action on the ground, among others, that the District Court should not "exercise its jurisdiction to enjoin the enforcement of state statutes which have not been authoritatively construed by the state courts." The District Court, recognizing "the necessity of maintaining the delicate balance between state and federal courts under the concept of separate sovereigns," stated that "the constitutionality of state statutes requiring special competence in the interpretation of local law should not be determined by federal courts in advance of a reasonable opportunity afforded the parties to seek an adjudication by the state court," but considered that relief should be granted where "the statute is free from ambiguity and there remains no reasonable interpretation which will render it constitutional . . . ." 159 F. Supp., at 522, 523. On this basis, the court, one judge dissenting, held Chapters 31, 32, and 35 unconstitutional, and permanently enjoined their enforcement against NAACP and Fund. Chapters 33 and 36, on the other hand, the court unanimously found vague and ambiguous. It accordingly retained jurisdiction as to those Chapters, without reaching their constitutionality, allowing the complaining parties a reasonable time within which to obtain a state interpretation.

The Commonwealth defendants, proceeding under 28 U. S. C. § 1253, appealed to this Court the lower court's disposition of Chapters 31, 32, and 35. We noted probable jurisdiction. 358 U. S. 807. NAACP and Fund did not appeal the disposition of Chapters 33 and 36.

The three Virginia statutes before us are lengthy, detailed, and sweeping. Chapters 31 and 32 are registration statutes. Chapter 31 deals with the rendering of financial assistance in litigation. It proscribes the public solicitation of funds, and the expenditure of funds from whatever source derived, for the commencement or fur-

ther prosecution of an "original proceeding," by any person, broadly defined to include corporations and other entities, which is neither a party nor possessed of a "pecuniary right or liability" in such proceeding, unless a detailed annual filing is made with the State Corporation Commission. If such person is a corporation, the filing must include among other things, (1) certified copies of its charter and by-laws; (2)"a certified list of the names and addresses of the officers, directors, stockholders, members, agents and employees or other persons acting for or in [its] behalf;" (3) a certified statement of the sources of its income, however derived, including the names and addresses of contributors or donors if required by the Commission; (4) a detailed certified statement of the corporation's expenditures for the preceding year, the objects thereof, and whatever other information relative thereto may be required by the Commission; and (5) a certified statement of the "counties and cities in which it proposes to or does finance or maintain litigation to which it is not a party." Correspondingly broad disclosures are required of individuals who fall within the statutory proscription.

Violation of this Chapter is punishable as a misdemeanor for individuals, and by a fine of not more than $10,000 for corporations, plus a mandatory denial or revocation of authority to do business within the State in the case of a foreign corporation. An individual "acting as an agent or employee" of a corporation or other entity with respect to activity violative of the Chapter is deemed guilty of a misdemeanor. And directors, officers, and "those persons responsible for the management or control of the affairs" of a corporation or other entity are made jointly and severally liable for whatever fines might be imposed on it.

Chapter 32 deals with activities relating to the passage of racial legislation, with advocacy of "racial integration or segregation," and also with the raising and expenditure

of funds in connection with racial litigation. Declaring that the "continued harmonious relations between the races are . . . essential to the welfare, health and safety of the people of Virginia," the Chapter finds it "vital to the public interest" that registration be made with the State Corporation Commission by "persons, firms, partnerships, corporations and associations whose activities are causing or may cause interracial tension and unrest." Specifically, under § 2 of this Chapter, annual filings are required of

> "[e]very person, firm, partnership, corporation or association, whether by or through its agents, servants, employees, officers, or voluntary workers or associates, who or which engages as one of its principal functions or activities in the promoting or opposing in any manner the passage of legislation by the General Assembly in behalf of any race or color, or who or which has as one of its principal functions or activities the advocating of racial integration or segregation or whose activities cause or tend to cause racial conflicts or violence, or who or which is engaged or engages in raising or expending funds for the employment of counsel or payment of costs in connection with litigation in behalf of any race or color, in this State . . . ."

The extent of such filing is comparable to that required by Chapter 31. The information so furnished is a matter of public record, to "be open to the inspection of any citizen at any time during the regular business hours of" the State Corporation Commission.

Failure to register subjects individuals to punishment as for a misdemeanor, and corporations to a fine not exceeding $10,000. Like Chapter 31, Chapter 32 also makes "responsible" persons liable jointly and severally for corporate fines. Further, "[e]ach day's failure to

register and file the information required . . . shall constitute a separate offense and be punished as such." The Chapter is not applicable to persons or organizations which carry on the proscribed activities through matter which may qualify as second-class mail in the United States mails, or by radio or television, nor to persons or organizations acting in connection with any political campaign.

Chapter 35 is a "barratry" statute. Barratry is defined as "the offense of stirring up litigation." A "barrator" is thus a person or organization which "stirs up litigation." Stirring up litigation means "instigating," which in turn "means bringing it about that all or part of the expenses of the litigation are paid by the barrator," or by those, other than the plaintiffs, acting in concert with him, "unless the instigation is justified." An instigation is "justified" when "the instigator is related by blood or marriage to the plaintiff whom he instigates, or . . . is entitled by law to share with the plaintiff in money or property that is the subject of the litigation or . . . has a direct interest ["personal right or a pecuniary right or liability"] in the subject matter of the litigation or occupies a position of trust in relation to the plaintiff; or . . . is acting on behalf of a duly constituted legal aid society approved by the Virginia State Bar which offers advice or assistance in all kinds of legal matters to all members of the public who come to it for advice or assistance and are unable because of poverty to pay legal fees."

Individuals guilty of barratry as defined in the Chapter are punishable as for a misdemeanor and "shall" have their licenses "to practice law or any other profession . . . revoked for such period as provided by law." Corporations are subject to a fine of not more than $10,000 and, if they are foreign, mandatory revocation of their authority to do business within the State. Moreover, a "person who aids and abets a barrator by giving money or render-

ing services to or for the use or benefit of the barrator for committing barratry shall be guilty of barratry and punished . . . ." A host of exceptions to which the Chapter is not applicable is provided;[1] none of these has thus far been asserted to include, or to be capable of including, appellees.

The majority below held Chapters 31 and 32[2] unconstitutional on similar grounds, centering its treatment of both around § 2 of Chapter 32, the material provisions of which have already been set forth, p. 172, *supra*. In essence § 2 was found to infringe rights assured under the Fourteenth Amendment, in that, taken in conjunction with the registration requirements of the statute, (1) the clause relating to the promoting or opposing of racial legislation invaded rights of free speech because it was not restricted to lobbying activities;[3] (2) the clause directed

---

[1] "This article shall not be applicable to attorneys who are parties to contingent fee contracts with their clients where the attorney does not protect the client from payment of the costs and expense of litigation, nor shall this article apply to any matter involving annexation, zoning, bond issues, or the holding or results of any election or referendum, nor shall this article apply to suits pertaining to or affecting possession of or title to real or personal property, regardless of ownership, nor shall this article apply to suits involving the legality of assessment or collection of taxes or the rates thereof, nor shall this article apply to suits involving rates or charges or services by common carriers or public utilities, nor shall this article apply to criminal prosecutions, nor to the payment of attorneys by legal aid societies approved by the Virginia State Bar, nor to proceedings to abate nuisances. Nothing herein shall be construed to be in derogation of the constitutional rights of real parties in interest to employ counsel or to prosecute any available legal remedy under the laws of this State."

[2] Chief Judge Hutcheson, the dissenting judge, did not reach the constitutionality of any of these statutes, because of his views on the "abstention" issue.

[3] In this, the District Court relied on *United States* v. *Harriss*, 347 U. S. 612.

at advocacy of racial "integration or segregation" had the same infirmity because it was not supported by a compelling state interest or some clear and present danger;[4] (3) the clause referring to activities causing or tending to cause racial conflicts or violence was too vague and indefinite to satisfy constitutional requirements;[5] and (4) the clause aimed at the raising and expending of funds in connection with racial litigation unduly burdened the right of access to the courts, and did not serve an interest which could support a disclosure as broad as the one demanded.[6]

Chapter 35, the "barratry" statute, was held to offend due process, in that it was found to be aimed not at the legitimate regulation of the practice of law but at preventing NAACP and Fund from continuing "their legal operations." In addition, the court held the Chapter to violate equal protection by unjustifiably discriminating between the racial litigation activities of the appellees and the general litigation efforts of "approved" legal aid societies.

These constitutional holdings were made in the context of findings that Chapters 31, 32, and 35, as well as Chapters 33 and 36 not presently before us, were passed by the Virginia Legislature "to nullify as far as possible the effect of the decision of the Supreme Court in *Brown* v. *Board of Education*, 347 U. S. 483 . . . as parts of the general plan of massive resistance to the integration of

[4] The lower court cited, among other cases, *American Communications Assn.* v. *Douds*, 339 U. S. 382; *Schenck* v. *United States*, 249 U. S. 47; *Dennis* v. *United States*, 341 U. S. 494; *Buchanan* v. *Warley*, 245 U. S. 60; *Grosjean* v. *American Press Co.*, 297 U. S. 233; *Thomas* v. *Collins*, 323 U. S. 516; and distinguished *Bryant* v. *Zimmerman*, 278 U. S. 63.

[5] Citing *United States* v. *Harriss, supra.*

[6] On the latter ground, the court distinguished such cases as *Cantwell* v. *Connecticut*, 310 U. S. 296, and *Burroughs* v. *United States*, 290 U. S. 534; and cited *Thomas* v. *Collins, supra.*

schools of the state under the Supreme Court's decrees." 159 F. Supp., at 511, 515. In the view we take of this case we do not reach appellants' objections to these findings.

According every consideration to the opinion of the majority below, we are nevertheless of the view that the District Court should have abstained from deciding the merits of the issues tendered it, so as to afford the Virginia courts a reasonable opportunity to construe the three statutes in question. In other words, we think that the District Court in dealing with Chapters 31, 32, and 35 should have followed the same course that it did with respect to Chapters 33 and 36.

This now well-established procedure is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system. To minimize the possibility of such interference a "scrupulous regard for the rightful independence of state governments . . . should at all times actuate the federal courts," *Matthews* v. *Rodgers,* 284 U. S. 521, 525, as their "contribution . . . in furthering the harmonious relation between state and federal authority . . . ." *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496, 501. In the service of this doctrine, which this Court has applied in many different contexts, no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. See, *e. g., Railroad Comm'n* v. *Pullman Co., supra; Chicago* v. *Fieldcrest Dairies, Inc.,* 316 U. S. 168; *Spector Motor Service, Inc.,* v. *McLaughlin,* 323 U. S. 101; *American Federation of Labor* v. *Watson,* 327 U. S. 582; *Shipman* v. *DuPre,* 339 U. S. 321; *Albertson* v. *Millard,* 345 U. S.

242; *Government & Civic Employees* v. *Windsor*, 353
U. S. 364. This principle does not, of course, involve the
abdication of federal jurisdiction, but only the postpone-
ment of its exercise; it serves the policy of comity inherent
in the doctrine of abstention; and it spares the federal
courts of unnecessary constitutional adjudication. See
*Chicago* v. *Fieldcrest Dairies, Inc., supra,* at 172–173.

The present case, in our view, is one which calls for
the application of this principle, since we are unable
to agree that the terms of these three statutes leave no
reasonable room for a construction by the Virginia courts
which might avoid in whole or in part the necessity for
federal constitutional adjudication, or at least materially
change the nature of the problem.

It certainly cannot be said that Chapter 35 does not
require a construction by the state courts. As appellants
asserted here and in the court below, the Chapter might
well be read as requiring a "stirring up" of litigation in
the conventional common-law sense, in addition to the
"unjustified" payment of litigation expenses. Were it to
be so read, the statute might then not even apply to these
appellees since the lower court found the evidence "uncon-
tradicted that the initial steps which have led to the insti-
tution and prosecution of racial suits in Virginia with the
assistance of the Association and the Fund have not been
taken until the prospective plaintiffs made application to
one or the other of the corporations for help." 159 F.
Supp., at 533. Further the "personal right" component of
"direct interest" in the statutory definition of "justified"
instigation (see p. 173, *supra*) might lend itself to a con-
struction which would embrace nonparty Negro contrib-
utors to litigation expense, including NAACP because
of the relationship of that organization to its members.
Cf. *NAACP* v. *Alabama,* 357 U. S. 449.

The possibility of limiting interpretation, characteristic
of constitutional adjudication, also cannot be ignored.

*Government & Civic Employees* v. *Windsor, supra.* The "advocacy" clause of Chapter 32, for example, might be construed as reaching only that directed at the incitement of violence. Cf. *Yates* v. *United States,* 354 U. S. 298. Similar construction might be employed with respect to the clause in that Chapter relating to the influencing of legislation "in any manner," cf. *United States* v. *Harriss, supra;* *United States* v. *Rumely,* 345 U. S. 41. And, in connection with these and the membership and contributor list requirements of Chapters 31 and 32, cf. *NAACP* v. *Alabama, supra,* we note that Chapter 32 contains a separability clause, and that the Supreme Court of Appeals of Virginia treats legislative acts as separable, where possible, even in the absence of such an express provision. See *Woolfolk* v. *Driver,* 186 Va. 174, 41 S. E. 2d 463.

We do not intimate the slightest view as to what effect any such determinations might have upon the validity of these statutes. All we hold is that these enactments should be exposed to state construction or limiting interpretation before the federal courts are asked to decide upon their constitutionality, so that federal judgment will be based on something that is a complete product of the State, the enactment as phrased by its legislature and as construed by its highest court. The Virginia declaratory judgment procedure, 2 Va. Code, 1950, §§ 8–578 to 8–585, which the appellees are now pursuing with reference to Chapters 33 and 36, also provides an expeditious avenue here. And of course we shall not assume that the Virginia courts will not do their full duty in judging these statutes in light of state and federal constitutional requirements.

Because of its findings, amply supported by the evidence, that the existence and threatened enforcement of these statutes worked great and immediate irreparable injury on appellees, the District Court's abstention with respect to Chapters 33 and 36 proceeded on the assump-

tion "that the defendants will continue to cooperate, as they have in the past, in withholding action under the authority of the statutes until a final decision is reached . . . ." 159 F. Supp., at 534. In this Court counsel for the appellants has given similar assurances with respect to the three statutes presently before us, assurances which we understand embrace also the intention of these appellants never to proceed against appellees under any of these enactments with respect to activities engaged in during the full pendency of this litigation. While there is no reason to suppose that such assurances will not be honored by these or other Virginia officials not parties to this litigation, the District Court of course possesses ample authority in this action, or in such supplemental proceedings as may be initiated, to protect the appellees while this case goes forward.

Accordingly, the judgment below will be vacated and the case remanded to the District Court, with instructions to afford the appellees a reasonable opportunity to bring appropriate proceedings in the Virginia courts, meanwhile retaining its own jurisdiction of the case, and for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BRENNAN concur, dissenting.

The rule invoked by the Court to require the Federal District Court to keep hands off this litigation until the state court has construed these laws is a judge-made rule. It was fashioned in 1941 in the decision of *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496, as a device to avoid needless decisions under the Federal Constitution where a resolution of state law questions might make those adjudications unnecessary. Since that time, the rule of the *Pullman* case has been greatly expanded. It

has indeed been extended so far as to make the presence in federal court litigation of a state law question a convenient excuse for requiring the federal court to hold its hand while a second litigation is undertaken in the state court. This is a delaying tactic that may involve years of time and that inevitably doubles the cost of litigation. When used, widespread, it dilutes the stature of the Federal District Courts, making them secondary tribunals in the administration of justice under the Federal Constitution.

With all due deference, this case seems to me to be the most inappropriate one of all in which to withhold the hand of the Federal District Court. Congress has ordained in the Civil Rights Act that "All persons within the jurisdiction of the United States shall have the same right in every State . . . to sue, be parties, give evidence . . . as is enjoyed by white citizens . . . ." 42 U. S. C. § 1981. It has subjected to suit "Every person who, under color of any statute, . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights . . . secured by the Constitution and laws . . ." 42 U. S. C. § 1983; and has given the District Courts "original jurisdiction" of actions "to redress the deprivation, under color of any State law, . . . of any right . . . secured by the Constitution of the United States or any Act of Congress providing for equal rights of citizens . . . ." 28 U. S. C. § 1343. The latter section was invoked here. From the time when Congress first implemented the Fourteenth Amendment by the comprehensive Civil Rights Act of 1871 the thought has prevailed that the federal courts are the unique tribunals which are to be utilized to preserve the civil rights of the people. Representative Dawes, in the debate on the 1871 bill, asked "what is the proper method of thus securing the free and undisturbed enjoyment of these rights?" Looking to the Act which eventually

became law he answered, "The first remedy proposed by this bill is a resort to the courts of the United States.* Is that a proper place in which to find redress for any such wrongs? If there be power to call into the courts of the United States an offender against these rights, privileges and immunities; and hold him to account there, . . . I submit . . . that there is no tribunal so fitted, where equal and exact justice would be more likely to be meted out in temper, in moderation, in severity, if need be, but always according to the law and fact, as that great tribunal of the Constitution." Cong. Globe, 42d Cong., 1st Sess. 476 (1871).

It seems plain to me that it was the District Court's duty to provide this remedy, if the appellees, who invoked that court's jurisdiction under the Civil Rights Act, proved their charge that the appellants, under the color of the Virginia statutes, had deprived them of civil rights secured by the Federal Constitution. See *Hague* v. *C. I. O.,* 307 U. S. 496, 530–532.

Judge Soper, speaking for the three-judge District Court, said that the five statutes against which the suits were directed "were enacted for the express purpose of impeding the integration of the races in the public schools" of Virginia. 159 F. Supp. 503, 511. He reviewed at length the legislative history of the five Virginia statutes (*id.,* 511–515) concluding that "they were

---

*It was not until 1875 that Congress gave the federal courts general jurisdiction over federal-question cases. 18 Stat. 470. The choice made in the Civil Rights Acts of 1870 and 1871 to utilize the federal courts to insure the equal rights of the people was a deliberate one, reflecting a belief that some state courts, which were charged with original jurisdiction in the normal federal-question case, might not be hospitable to claims of deprivation of civil rights. Whether or not that premise is true today, the fact remains that there has been no alteration of the congressional intent to make the federal courts the primary protector of the legal rights secured by the Fourteenth and Fifteenth Amendments and the Civil Rights Acts.

passed to nullify as far as possible the effect of the decisions" of this Court in *Brown* v. *Board of Education,* 347 U. S. 483, 349 U. S. 294. *Id.,* 511. They were indeed "parts of the general plan of massive resistance" which Virginia inaugurated against those decisions. *Id.,* 515.

Of course Virginia courts were not parties to the formulation of that legislative program. But they are interpreters of Virginia laws and bound to construe them, if possible, so that the legislative purpose is not frustrated. Where state laws make such an assault as these do on our decisions and a State has spoken defiantly against the constitutional rights of the citizens, reasons for showing deference to local institutions vanish. The conflict is plain and apparent; and the federal courts stand as the one authoritative body for enforcing the constitutional right of the citizens.

This Court has had before it other state schemes intended to emasculate constitutional provisions or circumvent our constitutional decisions. In *Guinn* v. *United States,* 238 U. S. 347, a "Grandfather Clause" in an Oklahoma suffrage statute, exempting citizens who were qualified to vote on January 1, 1866, and their lineal descendants, from the requirements of a literacy test was said to have "no discernible reason other than the purpose to disregard the prohibitions of the [Fifteenth] Amendment," and was struck down because in "direct and positive disregard" of that Amendment. *Id.,* pp. 363, 365. Oklahoma sought to avoid the effects of that decision (rendered in 1915) by requiring all qualified voters in 1916 to register within a named 12-day period, else the right to vote would be lost to them permanently. Persons who voted in the 1914 election were, however, exempt from the requirement. The new statute was invalidated, this Court noting that the Fifteenth Amendment barred "sophisticated as well as simple-minded" "contrivances by a state to thwart equality in

the enjoyment of the right to vote." *Lane* v. *Wilson*, 307 U. S. 268, 275. The Boswell Amendment to the Alabama Constitution required prospective voters to understand and explain a section of the Alabama Constitution to the satisfaction of a registrar. A three-judge court found it to be a device in purpose and in practice to perpetuate racial distinctions in regulation of suffrage. We affirmed the judgment without requiring any submission of the amendment to the state courts to see how they might narrow it. *Schnell* v. *Davis*, 336 U. S. 933, affirming 81 F. Supp. 872. All these cases originated in federal courts and implicated state laws evasive of our decisions; and we decided them without rerouting them through the state courts.

A similar history is evidenced by the "White Primary" cases. It starts with *Nixon* v. *Herndon*, 273 U. S. 536, where a Texas statute prohibiting Negroes from participating in Democratic Party primary elections was characterized as a "direct and obvious infringement" of the Fourteenth Amendment's Equal Protection Clause. As a result of that decision, the Texas Legislature enacted a new statute authorizing the State Executive Committee of a political party to prescribe the qualifications for voters in its primary elections. Pursuant thereto the Democratic Party Committee adopted a resolution limiting the voting privilege to white Democrats. Finding that the Committee was an arm of the State, and that it discharged its power in such a way as to "discriminate invidiously between white citizens and black" this Court overturned the restriction. *Nixon* v. *Condon*, 286 U. S. 73, 89. In *Smith* v. *Allwright*, 321 U. S. 649, we held that approval by the state party convention of the discriminating prohibition did not save it. And see *Terry* v. *Adams*, 345 U. S. 461. These cases too originated in federal courts and were aimed at state laws at war with our decisions. Here, again, we decided them without

making the parties first repair to the state courts for a construction of the state statutes.

We need not—we should not— give deference to a state policy that seeks to undermine paramount federal law. We fail to perform the duty expressly enjoined by Congress on the federal judiciary in the Civil Rights Acts when we do so.

To return to the present case: the error, if any, of the District Court was not in passing on the constitutionality of three of the five Virginia statutes now before us but in remitting the parties to the Virginia courts for a construction of the other two.