Joseph A. JORDAN, Jr., E. A. Dawley, Jr., L. W. Holt, Plaintiffs,

v.

Joseph C. HUTCHESON, Chairman, Virginia's Legislative Committee on Offenses against the Administration of Justice, William H. King, Honorable Charles Leavitt, City Sergeant, Committee on Offenses against the Administration of Justice, Defendants.

Civ. A. No. 3688.

United States District Court
E. D. Virginia,
Norfolk Division.
Aug. 27, 1962.

Jordan, Dawley & Holt, Norfolk, Va., for plaintiffs.

William H. King, Richmond, Va., Fred T. Gray and Robert McIlwane, Asst. Attys. Gen. of Virginia, Richmond, Va., and Charles R. Cloud, Norfolk, Va., for defendants.

WALTER E. HOFFMAN, Chief Judge.

This action is instituted by three Negro attorneys, members of the Virginia State Bar, seeking a declaratory judgment, damages and preliminary and permanent injunctions against the defendants, most of whom are members of a Virginia legislative committee created by an Act of the General Assembly (Chap. 373, Acts of Assembly 1958). Plaintiffs pray that this court restrain the defendants from "further harassment, intimidation and other unlawful acts—done under color of law—as part of a conspiracy" to prevent plaintiffs from continuing to oppose racial segregation.

Plaintiffs allege that "as a part of the conspiracy and program of destroying those who oppose segregation, the Virginia General Assembly passed laws creating * * * THE COMMITTEE ON OFFENSES AGAINST THE ADMINISTRATION OF JUSTICE." They allege that "the sole function of this committee * * * has been to investigate, harass, intimidate and urge the prosecution of those lawyers who are willing to handle cases which may result in an end to some of the forms of racial segregation and racial discrimination so prevalent in Virginia."

It is further alleged in the complaint that plaintiffs have been "investigated" by the defendants, that the defendants have "urged and asked" plaintiffs' clients to "abandon" them, and that defendants "did further state, publish and cause to be published statements and papers" pointing out plaintiffs as violators of the laws. Plaintiffs allege that on or about September 7, 1961, the defendants did "raid" the plaintiffs' offices "seeking to gather confidential papers and notes in violation of the attorney-client relationship" and that the defendants stated that they intended to continue harassing and raiding plaintiffs' offices.

Plaintiffs also contend that "this conspiracy and abuse of power by the defendants" is being done "under color of laws" and that irreparable damage has been, is being, and will be done in the future unless this court grants injunctive relief. Adopting the language of the complaint, it is said that "restraint of these practices is sought on the grounds that the practices are contrary to the First and Fourteenth Amendments of the United States Constitution and are the end product of a conspiracy to preserve racial segregation and prevent black men from opposing it."

A temporary restraining order was issued on September 26, 1961. Thereafter motions for extension of the restraining order, for preliminary injunction and various others were filed by plaintiffs and a motion to dismiss was tendered by defendants. A hearing was held on these various motions on October 23, 1961, at which time decision on the motion to dismiss was deferred and time allowed for the parties to submit briefs in support of their respective positions. In the interim period pending decision on the motion to dismiss the defendants assured the court that no further action would be taken by them.

The controlling question appears to be whether a federal court has the authority to enjoin a state legislative committee from performing its duties under a statute which has been declared constitutional by the highest court of the state, on the grounds that (1) the purpose or "function" for which the committee was created is unconstitutional, and (2) the committee has acted or is authorized to act beyond the scope of the legislative function in assuming powers properly reserved to the executive or judicial branches of government.

The authority of the committee is granted by the Code of Virginia, 1950, as amended, §§ 30–42 through 30–51. The

various statutes in controversy make no mention of race or racial problems.

At the outset the plaintiffs are met with the decision in National Ass'n for Advancement of Colored People v. Committee on Offenses, etc., 201 Va. 890, 114 S.E.2d 721, where the Supreme Court of Appeals of Virginia considered the same statutes. Essentially all of the points now raised by the plaintiffs have been before Virginia's highest court with no application for certiorari.

It is to be noted that plaintiffs are not attacking the constitutionality of the statute itself, the main thrust of their argument being that the statute was enacted with an improper "motive" on the part of the state legislature which created the Committee on Offenses to perform an unconstitutional "function."

It appears well settled that it is not within the function of the judiciary to inquire into the subjective mental processes behind the enactment of legislation or into the wisdom of legislative provisions. Fletcher v. Peck, 6 Cranch 87, 3 L.Ed. 162 (1810); Sonzinsky v. United States, 300 U.S. 506, 57 S.Ct. 554, 81 L.Ed. 772 (1936). The few cases which have raised the question of whether declaratory judgments, damages or injunctions may be successfully sought against members of duly constituted legislative committees, when they are acting within the bounds of the legislative function, have generally been resolved in favor of the legislative committee members. This result has usually been premised upon either the doctrine of separation of powers between the three great branches of our government, or the concept of legislative privilege as it comprehends immunity from civil process of legislators while they are acting in a legislative capacity.

The case which perhaps is most closely applicable to the case at bar is that of Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 653 (1951), in which the plaintiff had refused to testify before a legislative committee of the California Senate and was thereafter prosecuted for contempt and acquitted. He then sued the members of the committee for damages under the Federal Civil Rights Statutes, contending that the defendants had deprived him of rights guaranteed to him by the Constitution of the United States. Plaintiff alleged that the committee hearing was not held for "a legislative purpose" but was designed "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights of free speech, etc." After discussing the privilege of legislators to be exempt from civil process for what they do or say in the process of legislative proceedings, the court said (341 U.S. 377, 71 S.Ct. 788):

"The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good.

＊　＊　＊　＊　＊　＊

"The holding of this Court in Fletcher v. Peck, 6 Cranch 87, 130, [3 L.Ed. 162] that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned. ＊ ＊ ＊

"Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the

bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive."

In Pauling v. Eastland, D.C.C.A., 288 F.2d 126, plaintiff was directed by the Subcommittee on Internal Security of the United States Senate to appear before it and to bring with him all signatures to a certain petition presented by him on a particular date to the Secretary-General of the United Nations. He was also directed to bring all the letters of transmittal by which he had received such signatures. While plaintiff was willing to submit the signatures, he declined to disclose the letters of transmittal. Neither wishing to comply with the committee's directive nor desiring to render himself liable to a citation for contempt if he refused to comply, the plaintiff brought a civil action for a declaratory judgment and an injunction praying that the committee directive be declared void and its enforcement enjoined. The district court dismissed the complaint and, on appeal, the Court of Appeals for the District of Columbia affirmed, stating (288 F.2d 128, 129):

"It seems quite clear that as a matter of basic general principle a court cannot interfere with or impede the processes of the Congress by proscribing anticipatorily its inquiries.

\* \* \* \* \* \*

"The separation of powers principle is one of the basic concepts of the Constitution. The courts have no power of interference, unless and until some event, such as arrest, indictment or conviction, brings an actual controversy into the sphere of judicial authority. The courts cannot interfere merely upon the petition of a person potentially liable · to some such event."

To the same effect are the cases of Fischler v. McCarthy, D.C., 117 F.Supp. 643, aff. 2 Cir., 218 F.2d 164, and Mins v. McCarthy, D.C.C.A., 209 F.2d 307.

This is not to suggest that, in determining the constitutionality of legislation, a court is not permitted to examine the legislative history for the purpose of ascertaining the legislative purpose and intent. Joy v. Green, 194 Va. 1003, 76 S.E.2d 178; Adkins v. School Board of the City of Newport News, 148 F.Supp. 430, 433, aff. 4 Cir., 246 F.2d 325, cert. den. 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63. The present controversy is, however, a direct action against the members of a duly constituted legislative committee and is not maintainable irrespective of the motives of said committee.

Plaintiffs argue that, even though the authority of the Committee on Offenses may have been constitutionally delegated, the particular manner in which such authority has been exercised is unconstitutional. They rely upon United States v. Owlett, D.C., 15 F.Supp. 736, wherein the Pennsylvania legislature had created a committee to investigate the "organization, administration and functioning of the Works Progress Administration." An injunction against the committee was granted at the request of the United States on the ground that such an investigation was an interference with the proper governmental function of the United States. It is a far cry to say that plaintiffs are performing the functions of government. Moreover, in McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580—a case pertaining to a Senate committee investigation of the "Teapot Dome" scandals—the witness refused to appear and, following seizure under an attachment, sought a writ of habeas corpus on the ground that the committee was without authority to require him to testify. In denying the writ the Supreme Court said:

"The contention is earnestly made on behalf of the witness that this power of inquiry, if sustained, may be abusively and oppressively exerted. If this be so, it affords no ground for denying the power. The same contention might be directed

against the power to legislate, and of course would be unavailing. We must assume, for present purposes, that neither house will be disposed to exert the power beyond its proper bounds, or without due regard to the rights of witnesses."

■ While it is undoubtedly true that a legislative committee may exceed the bounds of its power and usurp powers or functions exclusively vested in the executive or judiciary, Tenney v. Brandhove, supra, and that legislative committees are restricted as to operation within their own province such as acquiring data to be used by the legislative bodies in solving problems within their governmental sphere, Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273, if the legislative committee is, in fact, effecting some valid legislative purpose and acting within the authority delegated by statute, such a committee is beyond interference by the judiciary.

The statutes in question disclose no delegation of executive or judicial powers. As stated in the earlier case of National Association, etc. v. Committee on Offenses, 199 Va. 665, 101 S.E.2d 631, 640:

"The obvious purpose of the Act is to authorize and direct the Committee to investigate and report on the manner in which such laws are administered and enforced by the proper officials. The Committee is given no power of execution or enforcement. Obviously, the fact that the executive department is charged with the function of executing the laws does not prohibit the legislative department from inquiring into the manner and result of such enforcement."

Plaintiffs cite Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1880), in which the plaintiff brought an action for false imprisonment because of his arrest under a warrant issued by order of the House of Representatives in a contempt proceeding. In his action Kilbourn asked damages against certain legislative committee members and the House sergeant-at-arms, Thompson. The background of the case reveals that the Secretary of the Treasury had deposited certain government funds with the firm of Jay Cooke & Co., which in turn had a substantial interest in a certain real estate "pool" in the District of Columbia. Jay Cooke & Co. went bankrupt, apparently as a result of its involvement with the "pool", and the Government stood to be a heavy loser. Consequently, although Jay Cooke & Co. was already in bankruptcy in a federal district court, the House created a legislative committee to make an investigation of the "pool". Kilbourn had refused to testify or to comply with a subpoena duces tecum issued by this committee, and was subsquently arrested and prosecuted for contempt. While the primary issue in the case seemed to be whether Congress had the power to punish private citizens for contempt of its authority, the decision was apparently based on the ground that the subject with which the contempt proceedings were concerned was beyond the authority of the House of Representatives to investigate. After deciding that the plea of legislative immunity was a good defense, the court said:

"In looking to the preamble and resolution under which the committee acted, before which Kilbourn refused to testify, we are of the opinion that the House of Representatives not only exceeded the limit of its own authority, but assumed a power which could only be properly exercised by another branch of the government, because it was in its nature clearly judicial."

After pointing out that the debtor firm, Jay Cooke & Co., was already before a court of competent jurisdiction, whose duty it was to ascertain the facts in regard to Jay Cooke & Co.'s dealings with the real estate "pool", and raising the question of the right of Congress to interfere, the court stated:

"The case being one of a judicial nature, for which the power of the courts usually afford the only rem-

edy, it may well be supposed that those powers were more appropriate and more efficient in aid of such relief than the powers which belong to a body whose function is exclusively legislative.

\* \* \* \* \* \*

"The resolution adopted as a sequence of this preamble contains no hint of any intention of final action by Congress on the subject. In all the argument of the case no suggestion has been made of what the House of Representatives or the Congress could have done in the way of remedying the wrong. \* \* \* Was it to be simply a fruitless investigation into the personal affairs of individuals? If so, the House of Representatives had no power or authority in the matter more than any other equal number of gentlemen interested for the government of their country. By 'fruitless' we mean that it could result in no valid legislation on the subject to which the inquiry referred."

■ The present action is not one which is already in the breast of a court of competent jurisdiction. It is clearly not a judicial function to revise the law merely because it may operate to some disadvantage upon a particular class of individuals. It can hardly be said that an investigation by the Committee on Offenses would be "fruitless" if, indeed, it did uncover facts relating to champerty, maintenance, barratry, running and capping, which may lead to legislative action in the future. Since the subject in question applies peculiarly to the field of the legal profession it follows that such an investigation will encompass a wide scope including attorneys representing insurance companies, unions, specialists in the fields of railroad law, admiralty, taxation and, as applied to the plaintiffs, those who seek to promote the constitutional rights of individuals and classes.

As a final word it should be noted that the Supreme Court of Appeals of Virginia has suggested an avenue for plaintiffs to proceed. In National Ass'n for Advancement of Colored People v. Committee on Offenses, etc., 201 Va. 890, 114 S.E.2d 721, 732, it is said:

"There are adequate remedies available to appellants in event the Committee causes process to be issued against them for the purposes set forth in Sections 3, 4, 5 and 6 of Chapter 373. They may refuse to testify and test the validity of the Act under a citation for contempt, or, as permitted by our procedure, they may do so by a motion to quash or vacate the subpoena or attachment."

While this court is not inclined to the view that one must always subject himself to criminal process to test the constitutionality of a state statute, Reid v. City of Norfolk, Virginia, D.C., 179 F. Supp. 768, 773, it is abundantly clear that plaintiffs may question the action of the Committee on Offenses by a motion to quash. This fact would, standing alone, justify invoking the doctrine of abstention, Harrison v. National Ass'n for Advancement of Colored People, 360 U.S. 167, 79 L.Ed. 1025, 3 L.Ed.2d 1152, but for other reasons stated herein the court is of the opinion that the several motions to dismiss must be sustained. On a motion to quash or vacate the subpoena or attachment, plaintiffs will have ample opportunity to raise questions pertaining to the alleged unlawful invasion of privacy, interference with relationship of attorney and client, etc.

Counsel for the defendants will prepare and present an appropriate order dismissing this action. It is assumed that, in the event the plaintiffs elect to appeal, and diligently prosecute same, the defendants will continue their prior assurances that no further action will be taken pending the outcome of such an appeal.