**FRALIN AND WALDRON, INC.,**
Plaintiff,

v.

**CITY OF MARTINSVILLE, VIR-
GINIA, et al., Defendants.**

Civ. A. No. 72–C–44–D.

United States District Court,
W. D. Virginia,
Danville Division.

March 28, 1973.

Young, Kiser & Haskins, Martinsville, Va., for plaintiff.

David B. Worthy, City Atty., for the City of Martinsville.

Joseph M. Winston, Jr., Special Counsel, Clement, Wheatley, Winston & Ingram, Danville, Va., for defendants.

## OPINION

TURK, Chief Judge.

Plaintiff, a Virginia corporation engaged in real estate development, has brought suit in federal court against the City of Martinsville, Virginia, a municipal corporation chartered under the laws of Virginia, and the individual members of the City Council and the Planning Commission of that city asking for declaratory and injunctive relief as well as damages. Jurisdiction of this court is predicated upon two grounds. Plaintiff contends that the actions of the defendants have violated his rights under the United States Constitution and that the amount in controversy exceeds $10,000.00 exclusive of interests and costs, thus conferring jurisdiction under Title 28 of the United States Code, section 1331. Jurisdiction is also based on the Civil Rights Acts, 42 U.S.C. § 1983 and 28 U.S.C. § 1343. Defendant has assumed without admitting that this court has jurisdiction under 28 U.S.C. § 1343. This is apparently the case since the decision of Lynch v. Household Finance Corporation, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). In addition, jurisdiction also attaches under 28 U.S.C. § 1331 since substantial federal questions have been raised by the plaintiff and the amount in controversy exceeds $10,000.00.

Having determined that this court has jurisdiction, before reaching the merits of the controversy, this court must address itself to the defendant's contention that on the facts of this case it is proper for the court to invoke the doctrine of abstention and have the plaintiff first seek redress in the courts of Virginia.

The facts are not in controversy and may be briefly stated. Plaintiff, pursuant to its business of developing real estate, on September 8, 1970, secured an option on approximately eighteen acres of property in Martinsville, Virginia, for the purpose of constructing 120 apartment units that would qualify for rental to tenants under Section 236 of the Housing and Urban Development Act of 1968. An additional option for three more lots was secured on November 22, 1971. After completing its planning and analysis of the construction on the proposed site, the plaintiff submitted to the United States Department of Housing and Urban Development (HUD) its proposal to construct the housing under Section 236 of the Housing and Urban Development Act of 1968.[1] HUD subsequently conducted its own feasibility study analyzing various criteria such as site suitability, need, costs, racial impaction, etc. Thereafter, on February 25, 1972, HUD issued its letter of feasibility approving the site for the construction of 120 units at a HUD participating cost of $1,771,200.00.

In the meantime, on December 14, 1971, plaintiff had applied to the City Council of Martinsville, Virginia for a special use permit pursuant to Section VIII of Appendix B of the Martinsville City Code.[2] This application was re-

---

1. 12 U.S.C. § 1707 et seq.

2. Section VIII. Regulations for Special Types of Uses.
   A. Preamble of intent.
   The division of the city into zoning districts is based on the premise that similar conditions prevail throughout a particular district. Some uses of land, for one or more of the following reasons, cannot normally appear as uses permitted outright in one or several of the districts. Such uses may have an unusually heavy impact on the adjoining uses, may involve a great area of land, may

be of a temporary or seasonal nature, or may be public or semipublic in character and consequently play a vital roll in the life of the community. Therefore, the location of these uses is subject to administrative review in order to insure that the best interests of the city will be served, that the health, safety, and general welfare of the community are protected, and that property values are not jeopardized.
   B. General conditions of special uses.
   1. Special use permits may be issued by the city council after public notice and hearing as required by law for changes and

Note 2—Continued

amendments to this ordinance and after submitting the same to the planning commission for its recommendation and report. Such uses shall meet the conditions and requirements specified for them. Such special use permits may be granted by the city council if it finds that the use:

a. Conforms to the types of special uses prescribed in this section;

b. Will not materially endanger the public health or safety if located where proposed and developed according to the plan submitted;

c. Meets all required conditions and specifications;

d. Will not substantially injure the value of adjoining or abutting property;

e. Is a public necessity; and

f. The location of the use is in general conformity with the plan for development of the city.

2. In addition to the specific conditions special uses shall comply with the height, yard, area, and parking regulations of the use districts in which they are permitted unless otherwise specified.

3. Modification of original plans may be reviewed and approved from time to time on just cause by the city council after review and recommendation of the planning commission; or the city council may delegate the approval of modifications to the planning commission.

4. All special use permits are subject to revocation by the city council after a public hearing and after the review and recommendation of the planning commission if the approved original or modified or amended plans, or the conditions specified therein or in the code or ordinance of the city, are not complied with.

5. No building permits or certificates of occupancy shall be issued by the building official except in conformance with approved plans or modifications thereto.

C. Types of special uses.

The types of special uses to which this section is applicable are as follows:

1. *Unified developments.* Unified developments consisting of two or more buildings to be constructed on a plot of ground not subdivided into the customary streets and lots and which will not be so subdivided, and unified developments to be located where the existing street and lot layout make it impracticable to apply the requirements of this ordinance to the individual buildings in such unified developments.

a. Unified housing developments may be permitted subject to this section, in a residential district and shall be located on land at least two acres in area. The petition for a special use permit shall be accompanied by plans showing:

(1) Topography of the site shown at contour intervals no greater than five (5) feet;

(2) The location and approximate size of existing and proposed buildings and structures within the site, and existing buildings and structures within five hundred (500) feet adjacent thereto;

(3) Proposed points of access and egress together with the proposed pattern of internal circulation;

(4) Proposed parking areas as required by this ordinance and service areas;

(5) Proposed schedule of development including the stages likely to be followed; and,

(6) Site plan of storm drainage and utilities.

(7) The following criteria shall be used, in addition to the foregoing cited requirements, in the consideration of any application for a permit allowing townhouse or similar development:

(a) Every developer of a townhouse project shall provide for, to the satisfaction of the city counsel, the establishment of a responsible corporate entity which shall be obligated and empowered to own, operate and maintain all common areas and facilities, and to assess against and collect from the owners of townhouse units the pro-rata cost of such ownership and maintenance.

(b) Maximum percentage of total area which may be subdivided into lots.......................... 45%

(c) Maximum dwelling unit density (per acre) ...................... 10

(d) Number dwelling units per structure (minimum).............. 3

Number dwelling units per structure (maximum).................. 8

(e) Minimum lot area (square feet) per unit.................... 1,800

(f) Front and rear yard requirements shall be the same as for single family detached dwellings in the same district.

(g) Minimum side yard for end and corner units (feet)................ 20

(h) Minimum lot width (feet).... 18

(i) Minimum distance between structures (feet).................. 40

(j) Minimum private street width, curb-to-curb (feet)................ 24

Minimum private street width, right-of-way (feet)................. 37

(k) Fencing and screen planting as determined by the Planning Commission.

(l) Staggering of unit from building line may be required at the discretion of the Planning Commission.

(m) Minimum parking spaces, off-streets, per unit.................. 2

ferred to the Planning Commission which recommended to the City Council that the application be denied. On April 11, 1972, the application was denied.

As an alternative to the special use permit, on March 11, 1972, plaintiff submitted to the Planning Commission a request for subdivision of the above mentioned property pursuant to Section IV of Appendix A of the City Code of Martinsville.[3] On April 20, 1972, the defendants of the Planning Commission denied the subdivision application.

Following this second setback plaintiff filed suit in this court seeking declaratory relief, a permanent injunction to have the City Council grant a special use permit or have the Planning Commission approve the application for a subdivision, and damages incurred by the plaintiff by the delay.

Plaintiff argues in his complaint that in denying its application for a special use permit defendants were arbitrary and unreasonable and effectively nullified the policy of the United States Gov-

---

3. Section IV. Procedure.

A. Preapplication procedure.

1. Previous to the filing of an application for conditional approval of the preliminary plat, the subdivider shall consult early with the agent of the commission concerning the subdivision plans of the subdivider. It is the intent of this requirement that the subdivider may familiarize himself with these regulations and that the agent of the commission and such personnel of the city as may be appropriate and concerned shall be afforded by the subdivider opportunity to advise and assist the subdivider prior to the preparation of the preliminary plat and related material.

B. Procedure for conditional approval of preliminary plat.

1. On completing action as provided in paragraph A above, and as required in section VII of this ordinance, the subdivider shall cause to be prepared a preliminary plat, together with improvement plans and other required or desirable supplementary material.

2. Five copies of the preliminary plat and supplementary material specified shall be submitted to the commission, through its agent, with written application for conditional approval, at least ten days prior to the meeting at which it is to be considered.

3. Following (a) review of the preliminary plat and other material submitted for conformity thereof to these regulations, and (b) conferences where deemed advisable, with the subdivision on changes deemed necessary, the commission shall, within thirty days following the meeting specified in paragraph 2 above, act thereon as submitted, or modified, and if approved, the commission shall express its approval as conditional approval and state the conditions, if any, of such approval, or if disapproved, shall express its disapproval and its reasons therefor.

4. The action of the commission shall be noted on two copies of the preliminary plat with any conditions determined, referenced and attached. One copy shall be returned to the subdivider and the other retained by the commission. The remaining copies shall be retained by the commission or distributed as it deems best.

5. Conditional approval of a preliminary plat shall not constitute approval of the final plat but shall be deemed an expression of approval to the layout submitted on the preliminary plat as a guide to the preparation of the final plat.

C. Procedure for approval of final plat.

1. The final plat will be submitted for approval of the commission and for recording upon fulfillment of these regulations and the conditions, if any, of the conditional approval.

2. The final plat shall conform substantially to the preliminary plat as approved, and, if desired by the subdivider, with the approval of the commission, it may constitute only that portion of the approved preliminary plat which he proposes to record and develop at the time; provided, however, that such portion conforms to all requirements of these regulations.

3. Application for approval of the final plat shall be submitted in writing to the commission, through its agent, at least ten days prior to the meeting at which it is to be considered.

4. Three copies of the final plat and other exhibits required for approval shall be prepared as specified in section V, and shall be submitted to the commission within nine months after conditional approval of the preliminary plat; otherwise, the conditional approval shall become null and void unless an extension of time, not to exceed a maximum of three additional months, is applied for and granted by the commission.

5. The commission shall, within sixty (60) days from the date of submission of the final plat to the commission, approve and return to the subdivider one copy of the final plat appropriately notated, or disapprove such plat. Failure to act within said sixty (60) days shall be deemed approval.

ernment embodied in the Housing and Urban Development Act of 1968. It is also argued that such action deprived plaintiff of equal protection of the law and made the city ordinances of Martinsville, Virginia, supreme to the laws of the United States. Related to the above claims is the argument that the ordinance is unconstitutional in application in that the criteria is arbitrary and the vagueness of the ordinance makes it subject to discriminatory application. Similar claims are made with respect to actions of the Planning Commission in denying plaintiff's subdivision plan.

The United States Supreme Court has discussed the doctrine of abstention on numerous occasions, and what emerges from a consideration of the opinions is that there are varying reasons for the doctrine being applied. A distinguished commentator of the law of federal courts has described these overlapping rationales for abstention as follows:

(1) to avoid decision of a federal constitutional question where the case may be disposed of on questions of state law;

(2) to avoid needless conflict with the administration by a state of its own affairs;

(3) to leave to the states the resolution of unsettled questions of state law; and

(4) to ease the congestion of the federal court docket.[4]

Both parties to this action in their briefs have quoted from various United States Supreme Court and Circuit Court cases to support their respective positions on the question of abstention, and there is no denying that the law is sufficiently unsettled that this court is left with a certain amount of discretion in its attempt to apply a unique factual sit-

uation to decided cases. *Compare,* County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959), with Louisiana Power and Light Company v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). After consideration of the development of the law in this area, it is the opinion of this court that it should abstain from deciding this case due to the fact that the first two rationales mentioned, *supra,* apply in some degree to this factual situation.

The application of the doctrine of abstention to avoid, if possible, decision of a federal constitutional question seems to have generated the least difference of opinion. This particular rationale has been referred to as the Pullman doctrine from the early case of Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) in which the Supreme Court held that a federal court should abstain from deciding a case but retain jurisdiction in those cases in which resolution of the state issues in the case might make unnecessary decision of the federal constitutional claim. The decision in *Pullman* has been consistently followed[5] with the Supreme Court unanimously following the rationale in the recent cases of Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) and Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). This court recognizes that the *Pullman* line of cases are not directly in point with the facts of the present case in that plaintiff has not alleged that there has been a violation of state law, the resolution of which would be dispositive of the case. But plaintiff has alleged that the city ordinance of Martinsville is vague, arbitrary and subject to discriminatory application. The courts of Virginia may make the federal constitutional issue moot or at least

---

4. C. Wright, Law of Federal Courts, § 52 (2d ed. 1970).

5. E. g., City of Chicago v Fieldcrest Dairies, Inc., 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355 (1942); American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L. Ed. 873 (1946); City of Meridian v. Southern Bell Tel. and Tel. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959); Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959).

present it in a different posture by interpreting the city ordinance in light of pertinent state law. County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 189, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959) and cases cited therein. It is entirely possible that the actions of the City Council and Planning Commission in this case might be found to be beyond the limits of their discretion as a matter of local land use law. If this should be the case, then the resolution of the federal constitutional claims would be made unnecessary or decided differently.

The second reason for abstention mentioned above, namely, to avoid needless conflict with the administration by a state of its own affairs, is also present to a certain degree in this case. The defendants have relied primarily on this ground citing the leading cases of Burford v. Sun Oil Co., 319 U.S. 315, 63 S. Ct. 1098, 87 L.Ed. 1424 (1943); Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 92 L.Ed. 1002 (1951), and Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959). It appears that the facts of the case at bar, while not presenting as strong a case for abstention as the factual situations in the cases cited above, are sufficiently analogous that thoses cases lend support to the decision to abstain. In Burford a proceeding was brought in federal district court to enjoin the enforcement of an order by the Texas Railroad Commission which had granted petitioner a permit to drill oil wells on a particular plot of land. The Supreme Court held that abstention was proper because of the complicated nature of the state regulatory system of oil and gas production. The court pointed out that Texas had provided a special system of thorough judicial review of Commission orders and that the confusion sought to be avoided by the state system of judicial review was revived by the exercise of federal equity jurisdiction. In these circumstances the court concluded that "a sound respect for the independence of state action requires the federal equity

court to stay its hand." Id. at 334 of 319 U.S., at 1107 of 63 S.Ct.

In the Alabama Public Service Commission case the court was faced with an appeal from the order of a three-judge federal district court enjoining the order of the Alabama Public Service Commission denying permission to discontinue certain intrastate train routes. The court held that abstention was proper due to the fact that it was essentially a local problem of balancing the loss to the railroad from continued operation of unprofitable train lines with the public need for service and that statutory appeal through the state courts which was an integral part of the regulatory process was an adequate means to review the Commission's order.

In Martin a federal district court had enjoined the Governor and Secretary of Highways of Pennsylvania from proceeding to designate limited access highways which affected the property of abutting property owners. The Pennsylvania courts had held that state procedures were available to protect plaintiff's constitutional rights, and the United States Supreme Court held that even if there was a basis for intervention by a federal equity court, abstention was appropriate. The court listed the following factors as counseling abstention in the case: Avoiding unseemly conflict between two sovereignties; the unnecessary impairment of state functions; the premature determination of constitutional questions; and the complex and varying effects which the contemplated state action might have on different landowners.

It is apparent that the line of cases represented by Burford, Alabama Public Service Commission, and Martin are not on all fours with the case at bar which, unlike Burford and Alabama Public Service Commission, is not challenging a complex state regulatory scheme; nor like Martin has there been assurance by the state courts that the plaintiff's rights would be protected. Nonetheless, there are similarities in that the courts of Virginia are accustomed to reviewing lo-

cal ordinances and are in a better position than a federal court to delineate the boundaries of local discretion in the area of land use in the first instance. For this court to sit as a board of zoning appeals from actions by a local city council and circumscribe local power with respect to special use permits and subdivision regulations would cause needless conflict with the administration by the state courts of concerns with which they have infinitely more expertise and experience. This not to say that this court will not be available to resolve the serious and substantial federal questions that plaintiff has raised, but it is the opinion of this court that in the area of local land use the state courts should, on the facts of this case, have the initial opportunity to consider the allegations raised.

Both parties to this action have relied on cases from the Fourth United States Circuit Court of Appeals to support their respective positions. When dealing with a question such as abstention in which the law is particularly unsettled and the precedents provide little guidance to the varying factual situations, it seems particularly appropriate to follow the dictates of the Circuit Court for the judicial circuit in which a District Court is located. In thus considering the decisions of the Court of Appeals for this circuit, it appears that it is appropriate to invoke the doctrine of abstention in this case.

The defendants have cited the cases of Blasecki v. City of Durham, North Carolina, 456 F.2d 87 (4th Cir. 1972) and Crawford v. Courtney, 451 F.2d 489 (4th Cir. 1971) to support their contention that this court should abstain. *Blasecki* involved a challenge to an ordinance prohibiting more than 50 people from assembling or congregating at a park in the downtown area of Durham, North Carolina, and authorizing the police to require the persons in excess of 50 to leave. The plaintiffs contended that the ordinance violated First Amendment freedoms of speech and assembly because, among other reasons, it was void

for vagueness in that it failed to define which persons would constitute an excess. The Court of Appeals stated:

"We think it inappropriate that we should attempt interpretation because one of the special circumstances making abstention appropriate 'is the susceptibility of a state statute of a construction by the state courts that would avoid or modify the constitutional question.' Zwickler v. Koota, 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967).

As was pointed out above, the ultimate constitutional issues in the case at bar might be mooted or modified by a state court construction of the Martinsville ordinance, which, like the ordinance in *Blasecki* is challenged as being void for vagueness. It is true, as the plaintiff here has pointed out, that the Court of Appeals after holding that it would not interpret the ordinance in the first instance, did affirm the decision of the district court that the ordinance was constitutional since it was susceptible of two interpretations. But this distinction does not drain *Blasecki* of its value as precedent on the issue of abstention, for the court did abstain from authoritatively and finally interpreting the statute. It is worth noting that in *Blasecki*, the issues before the court were the rights of speech and assembly—certainly areas of the law to which federal courts bring a particular expertise and commitment. Thus in considering the ordinance in question, the Court of Appeals could find the ordinance constitutional on its face yet abstain from construing it. In contrast, the case at bar involves the power over local land use— the limits of which are traditionally and appropriately left to the states in the first instance.

The *Crawford* case was a diversity action brought by the heirs of a grantor of certain property which had been condemned to settle the rights to a fund established by the condemnation of the property. The Court of Appeals upheld abstention since a lawsuit was already pending in a West Virginia Court, and

there was a possibility of inconsistent determinations. This case appears to offer little guidance to the case at bar because of its particular facts.

The plaintiff has cited the Fourth Circuit cases of Rivers v. Royster, 360 F.2d 592 (4th Cir. 1966) and Jordan v. Hutcheson, 323 F.2d 597 (4th Cir. 1963) for authority that abstention is inappropriate. The *Rivers* case involved a challenge by a state prisoner to the policy of the prison superintendent denying him the right to receive a nonsubversive Negro newspaper while White inmates were allowed to receive "White" newspapers. The court found that abstention was inappropriate because the law in question allowing prisoners to receive nonsubversive newspapers was clear. This makes the case easily distinguishable from the present case since the very contention raised by plaintiff is that the ordinance in question lacks clarity to the point of being constitutionally deficient.

The *Jordan* case was a class action under the Civil Rights Acts, 42 U.S.C. §§ 1981, 1983, by a group of Black attorneys against a state legislative committee and others to enjoin alleged harassment and intimidation and to seek damages and costs. In holding that abstention was not proper the court stated that the Virginia courts had already considered the constitutionality of the statute creating the committee whose actions were challenged and had declared itself unable to enjoin it under state law. The ordinance in the present case has not been challenged in the state courts, and thus the *Jordan* case does not provide precedent for this court to decline the invitation to abstain.

Although the court is of the opinion the cases discussed above from the Fourth United States Circuit Court of Appeals are generally in accord with its decision to abstain in this case, the plaintiff has also relied on two other cases in support of its position. The case of Holmes v. New York City Housing Authority, 398 F.2d 262 (2d Cir. 1968) is relied upon primarily because of the subject matter of the case. In that case applicants for public housing brought a class action under the Civil Rights Act, 42 U.S.C. § 1983 challenging the procedures employed by the New York City Housing Authority in the admission of tenants to low-rent public housing projects. The complaint concerned matters of procedural due process in the administration of public housing in New York City. The court rejected the defendant's contention that the decisions of Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1951), discussed *supra*, counseled abstention noting that those cases involved "problems calling for the comprehension and analysis of basic matters of state policy . . . which were complicated by nonlegal considerations of a predominately local nature." The case at bar is distinguishable from *Holmes* both on the ground that the plaintiff is alleging defects which are intimately related to local land use law and which may be disposed of by a state court decision or at least modified for purposes of adjudicating the constitutional claims.

Plaintiff has also relied on the case of Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) in which a New York law regulating the distribution of handbills was challenged on First Amendment grounds. The district court's jurisdiction was invoked under the Civil Rights Act as well as the Declaratory Judgment Act. In finding abstention inappropriate the Supreme Court stated that the statute was not being challenged on grounds of vagueness but rather overbreadth. The court found that the statute was not susceptible of a construction by the state courts that would avoid or modify the constitutional question. In the case at bar, it appears that the state courts might well limit the application of the ordinance in question so as to modify or avoid the constitutional question.

Of final import to this court are certain equitable considerations which must be balanced in deciding to abstain from reaching the merits of a case. Plaintiff has asserted that it is doubtful

that he could now repair to the state courts because under § 15.1–497 of the Virginia Code there is a thirty-day limitation on the bringing of actions against certain local authorities, and this statute is apparently jurisdictional. Were it true that plaintiff is now completely barred from seeking relief in state court, the decision to abstain might well be different, but it appears that the action of the Martinsville City Council may still be challenged in a declaratory judgment proceeding in the state courts since the action by a City Council are not encompassed by § 15.1–497 of the Virginia Code. Thus plaintiff may still present his claims to the Virginia courts and perhaps avoid the constitutional issues.

Plaintiff also asserts that given the present status of federal budget cuts, it is in danger of losing the commitment from HUD if the matter is unduly prolonged. Although, no support is offered for this contention beyond the statement, even if this were the case, it would not necessarily be appropriate for this court to forego the usual requirements of comity and risk the possibility of an unnecessary decision as well as the "friction of a premature constitutional adjudication." Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941).

The final issue that must be dealt with in disposing of this case is whether or not this court should retain jurisdiction while the plaintiff seek consideration of the ordinance in the state courts. The procedure in cases such as Railroad Commission v. Pullman, *supra,* is for federal courts generally to retain jurisdiction while the parties seek clarification of the state issues whereas in cases such as Burford v. Sun Oil Co. in which federal courts defer to avoid interference with state activities dismissal of the action rather than retention of jurisdiction pending a state determination is normally appropriate. See, C. Wright, Law of Federal Courts, 171 (1st ed. 1963). Inasmuch as this case involves to some degree the rationales used in both *Pullman* and *Burford,* the correct disposition is not completely clear. But on careful consideration it appears that this case is sufficiently like that of *Pullman* that the case should not be dismissed but rather this court will retain jurisdiction pending disposition of the claim in the state courts.

An interlocutory order will be entered accordingly.