CITY INVESTING COMPANY and GDV, Inc., Plaintiffs–Appellants,

v.

Edwin J. SIMCOX, Secretary of the State of Indiana, et al., Defendants–Appellees.

No. 79–1896.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1979.

Decided Oct. 17, 1980.

As Amended Oct. 22, 1980.

Jerold S. Solovy, Jenner & Block, Chicago, Ill., for plaintiffs–appellants.

Ronald J. Semler, Asst. Atty. Gen., Indianapolis, Ind., John W. Castles, III, Lord,

---

7. *Black's Law Dictionary* 1097 (4th rev. ed. 1968).

Day & Lord, New York City, for defendants–appellees.

Before SPRECHER and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.*

CUDAHY, Circuit Judge.

Plaintiffs–appellants City Investing Co. ("City") and GDV, Inc. ("GDV") brought this action in federal district court seeking, *inter alia*, to have the Indiana Takeover Offers Act, Ind. Code § 23–2–3.1–1 *et seq.* (Cum.Supp.1980) (the "Takeover Act" or the "Act"), declared unconstitutional under the supremacy and commerce clauses of the United States Constitution and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (1976), as amended by the Williams Act.[1] The district court abstained from deciding the merits of appellants' constitutional claims in light of what it perceived to be a potentially dispositive question of state law, the resolution of which, it felt, would render a decision on the federal constitutional claims unnecessary. We hold that the district court did not abuse its discretion in concluding that abstention was warranted under the circumstances of this case, and affirm.[2]

## I.

City and GDV are publicly–held Delaware corporations. Both maintain their principal places of business in New York City and neither conducts business in Indiana. City owns approximately ⅔ of GDV's outstanding common stock. Defendant–appellee Stokely–Van Camp, Inc. ("Stokely") is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Defendants–appellees Stephen M. Coons,

the Indiana Securities Commissioner, Edwin J. Simcox, the Secretary of State of Indiana, and Theodore L. Sendak, the Attorney General of Indiana, are charged by statute with various responsibilities in the administration and enforcement of the Takeover Act.

Between October 2, 1978 and April 23, 1979, GDV purchased a total of 168,400 shares of Stokely common stock in ordinary open market transactions on the New York Stock Exchange. These shares constituted 5.1% of the Stokely common stock outstanding as of February 25, 1979.[3] On May 2, 1979, as required by Section 13(d) of the Williams Act and the SEC rules promulgated thereunder, appellants filed a Schedule 13D with the SEC to report their acquisition of over 5% of Stokely's common stock. The Schedule 13D disclosed that:

GDV currently intends to acquire from time to time such number of additional shares of Common Stock that will, together with the shares of Common Stock currently owned by it, result in the ownership by GDV of in excess of 15% and as much as 20% of the outstanding voting securities of the Company [Stokely]. . . .

The purpose of the purchase of the 168,400 shares of Common Stock . . . and the proposed purchase of additional shares of Common Stock . . . is to provide GDV with an investment in the Company. The acquisition of such additional shares and the time of acquisition thereof are subject to market conditions.

While neither GDV nor City currently intends to seek representation on the Board of Directors of the Company or otherwise to seek to exercise control over the Company, they may, depending on

---

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

1. Pub.L.No. 90–439, 82 Stat. 454 (codified at 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f)(1976)).

2. We thus do not have occasion to reach the district court's alternative holding on the merits sustaining the Takeover Act's constitutionality. Cf. *MITE Corp. v. Dixon*, 633 F.2d 486 (7th Cir. 1980); *Great Western United Corp.*

*v. Kidwell*, 577 F.2d 1256 (5th Cir. 1978), *rev'd on venue grounds sub nom. Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979); *AMCA International Corp. v. Krouse*, 482 F.Supp. 929 (S.D.Ohio 1979).

3. GDV purchased an additional 3,800 shares of Stokely common between April 24, 1979 and May 22, 1979, and consequently now owns a total of 172,200 shares.

circumstances existing in the future, seek to acquire sufficient additional shares of Common Stock so that they can exercise control over the Company.

GDV and City reserve the right to acquire shares of Common Stock, in addition to those currently proposed to be acquired, at such prices and on such terms as GDV or City may deem advisable, through open market or private purchases or otherwise. In addition, GDV and City reserve the right to dispose of shares of Common Stock heretofore or which may hereafter be acquired, in the open market or in private transactions or otherwise. GDV and City also reserve the right to elect not to purchase any of the additional shares of Common Stock presently proposed to be acquired.

Shortly after the filing of the Schedule 13D, Stokely representatives contacted Commissioner Coons, claiming that GDV's real purpose was the acquisition of control of Stokely rather than mere investment. Coons requested that Stokely submit affidavits to support its claim, and primarily upon the basis of affidavits submitted by two Stokely officers, he issued a cease and desist order on May 22, 1979. The order was purportedly issued pursuant to Section 10(a) of the Takeover Act,[4] and, despite the Takeover Act's explicit prohibition against such action, it was issued without a hearing.[5] The order concluded, *inter alia*, that appellants had made a "takeover offer" in violation of the Takeover Act, and City and GDV were therefore directed to refrain from making any further purchases of Stokely stock.

On the same day on which he issued his cease and desist order, Coons also initiated an action in the Indiana Superior Court seeking to preliminarily and permanently enjoin appellants from acquiring any additional Stokely stock. The complaint filed in that action repeated the conclusion of the cease and desist order that appellants' purchases and Schedule 13D statements, together with the accompanying publicity, constituted a "takeover offer" within the meaning of the Act. Coons thereupon obtained an *ex parte* temporary restraining order from the Superior Court.

A hearing on Coons' request for a preliminary injunction was held on June 4, 1979. Coons appeared as a witness and testified as to his belief that GDV's purchases violated the Takeover Act. At the conclusion of the hearing, Coons' request for further injunctive relief was denied, and appellants' motion to dissolve the temporary restraining order was granted. The Superior Court ruled that Coons had failed to establish a prima facie case that GDV had made a takeover offer or that it had violated the Takeover Act. At the same time, however, the court also denied appellants' cross-motion to dismiss the complaint and refused to dissolve the May 22 cease and desist order.

On June 7, 1979, Coons issued an Order for Hearing, requiring appellants to show cause on June 15, 1979, why the cease and desist order of May 22 should not be continued in effect. On June 11, 1979, City and GDV filed their answer and counterclaim in the Superior Court action. The counterclaim put in issue each of the constitutional claims appellants assert on this appeal. That action is still pending.

Pursuant to their counterclaim, appellants also moved to dissolve the cease and desist order and to prohibit Coons from proceeding with the June 15 hearing. The Superior Court set aside the cease and desist order, on the sole ground that a hearing should have been held prior to its issuance,[6]

---

**4.** Section 10(a), Ind.Code § 23–2–3.1–10(a) (Cum.Supp.1980), provides in relevant part:

Whenever it appears to the commissioner that any person has engaged or is about to engage in any act or practice constituting a violation of any provision of this chapter or any regulation or order adopted under this chapter, the commissioner may investigate and issue orders and notices, including cease and desist orders and notices....

**5.** Section 9(c) of the Takeover Act, Ind.Code § 23–2–3.1–9(c) (Cum.Supp.1980) provides in relevant part:

An order may only be adopted under this chapter after a hearing....

**6.** *See* n.5, *supra.*

but the court refused to prohibit the June 15 hearing.

Coons then held an administrative hearing on June 15, 1979. All parties were present and represented by counsel. At the conclusion of the hearing, Coons issued a second cease and desist order, again concluding, *inter alia*, that appellants were engaged in a "takeover offer" in violation of the Takeover Act. The second cease and desist order, enjoining appellants from making further purchases of Stokely stock until they comply with the requirements of the Takeover Act, remains presently in effect.

On July 6, 1979, City and GDV filed a notice of appeal with the Indiana Court of Appeals from the second cease and desist order. The notice of appeal asserts the constitutional claims appellants present here, and also explicitly raises a number of questions concerning the applicability of the Takeover Act to appellants' conduct.

The complaint in the instant action was filed in the district court on June 1, 1979. Appellants alleged, *inter alia*, that the Takeover Act was preempted by the Williams Act, that it imposed an unjustifiable burden on interstate commerce in violation of the Commerce Clause, and that the use of a biased and prejudiced decision maker in the state's administrative proceedings violated their fourteenth amendment right to due process. The prayer was for both declaratory and injunctive relief.[7]

After a hearing on July 20 and 23, 1979, the district court entered a final judgment denying appellants any relief. As indicated, the district court abstained from deciding appellants' constitutional claims. In the alternative, it found those claims to be without merit.

## II.

Abstention is a doctrine of judicial origin, seminally articulated by the Supreme Court, through Justice Frankfurter, in *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In *Pullman,*

> the Court observed that the dispute before it implicated "a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." The Court found the "resources of equity" sufficient to accommodate an adjustment which would avoid "the friction of a premature constitutional adjudication" and obviate the need for a federal court to interpret state law without the benefit of an authoritative interpretation by a state court.... Thus evolved the doctrine of *Pullman* abstention: that a federal action should be stayed pending determination in state court of state–law issues central to the constitutional dispute.

*Moore v. Sims*, 442 U.S. 415, 427–28, 99 S.Ct. 2371, 2379–80, 60 L.Ed.2d 994 (1979).

Subsequent to the *Pullman* decision, two additional species of abstention have been recognized by the Supreme Court: *Burford*-type abstention[8] and *Younger*–type abstention.[9] *See Colorado River Water Con-*

---

7. The complaint also originally requested money damages in an unspecified amount. Upon oral motion by the state defendants, that claim was stricken from the complaint by the district court. No appeal has been taken from that action.

8. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

     The abstention doctrine as articulated in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) requires the district court to abstain and to relegate a federal question to the state courts "because of their superior competence to adjudicate such matters or because the federal issues touch matters of traditional state concern, the resolu-

tion of which is of singular importance to the administration of state affairs." *Wynn v. Carey*, 582 F.2d 1375, 1382–83 (7th Cir. 1978).

*Bickham v. Lashof*, 620 F.2d 1238, 1242, n.6 (7th Cir. 1980).

9. *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* required federal courts to abstain from restraining state criminal proceedings, absent bad faith, harassment, or a patently invalid state statute, out of proper respect for state functions. "After *Younger*, this doctrine was expanded to civil proceedings initiated by the state which were 'akin' to criminal prosecutions." *Bickham v. Lashof, supra* n.8, at 1242--43.

servation *District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Nonetheless, as the Supreme Court remarked in *Colorado River, supra* at 813, 96 S.Ct. at 1244:

> Abstention from the exercise of federal jurisdiction is the exception, not the rule. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order of the parties to repair to the State court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959).[10]

But the Supreme Court also explicitly recognized in *Colorado River* that, under the line of authority beginning with *Pullman,* "[a]bstention is appropriate 'in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law.'" *Colorado River, supra* at 814, 96 S.Ct. at 1244 (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)). Indeed, the Court observed in *Babbitt v. United Farm Workers,* 442 U.S. 289, 306, 99 S.Ct. 2301, 2313, 60 L.Ed.2d 895 (1979) that:

> "The paradigm of the 'special circumstances' that makes abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Kusper v. Pontikes,* 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973); see *Zwickler v. Koota,* 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967); *Harrison v. NAACP,* 360 U.S. 167, 176–177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959); *Railroad Comm'n*

*v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Of course, the abstention doctrine "contemplates that deference to state court adjudication only be made where the issue of state law is uncertain." *Harman v. Forssenius,* 380 U.S. 528, 534, 85 S.Ct. 1177, 1181, 14 L.Ed.2d 50 (1965). But when the state statute at issue is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," *id.,* at 535, 85 S.Ct. at 1182, abstention may be required "in order to avoid unnecessary friction in federal–state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication," *id.,* at 534, 85 S.Ct. at 1181.

The case before us falls squarely within "the paradigm of special circumstances" that makes *Pullman* abstention appropriate, for there is a substantial likelihood that the Indiana Courts will determine that the Takeover Act, newly enacted and yet to be construed, is inapplicable to appellants' activities. The Takeover Act purports to regulate what are defined in Section 1(i) of the Act as "takeover offers." That section provides:

> "Takeover offer" means an offer to acquire or an acquisition of any equity security of a target company, pursuant to a tender offer or request or invitation for tenders, if, after the acquisition, the offeror is directly or indirectly a record or beneficial owner of more than ten percent [10%] of any class of the outstanding equity securities of the target company. The term does not include an offer:
>
> > (1) Pursuant to an offer effected by or through a broker–dealer in the ordinary course of his business, without solicitation of orders, to sell equity securities of the target company ....

Ind.Code § 23–2–3.1–1(i) (Cum.Supp.1980).

As indicated above, GDV has acquired 5.1% of the outstanding common stock of

---

**10.** The rule of this circuit is to the same effect. See *Bickham v. Lashof, supra* n.8, at 1245.

Stokely (the target company) solely via unsolicited open market transactions on the New York Stock Exchange. In addition, appellants assert that all of the transactions were executed by the First Boston Corporation, a New York broker–dealer and investment banker, in the ordinary course of its business. In the face of these facts, it seems dubious to us that Coons' actions could have been validly undertaken under the Takeover Act. That Act applies only to acquisitions of 10% or more of a target company's stock; GDV has purchased but 5% of the outstanding Stokely common stock. The Act applies only to a "tender offer or request or invitation for tenders;" GDV has made only unsolicited purchases.[11] Most glaringly of all, the statute *expressly exempts* ordinary broker–dealer transactions; those are the very sort of transactions in which GDV has engaged.[12]

In issuing his cease and desist orders, Commissioner Coons concluded that GDV's open market purchases, together with the widespread circulation given its Schedule 13D, which stated an interest in potential acquisition of 15 to 20% of Stokely's stock, constituted in effect a tender offer by another name. Coons apparently reasoned that the publicity attendant to the filing of the 13D (which he found would by itself cause investors to tender their shares), constituted the element of solicitation necessary to place GDV's conduct outside the Act's broker–dealer exemption (which exempts only unsolicited broker–dealer transactions), and thereby within the Act's definition of a "takeover offer." Coons reached this conclusion despite the absence of any evidence in the record indicating that GDV had initiated or sought any of the publicity which the filing of the 13D engendered.[13]

Without trying to anticipate the conclusion of the Indiana courts, to us Coons' construction of the Act has all the earmarks of a "hometown call." Indeed, were his interpretation to be sustained by the Indiana courts, the conflict with the Williams

11. Neither the Takeover Act nor the Williams Act defines the term "tender offer." "A tender offer has been conventionally understood to be a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price." Note, *The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934*, 86 Harv. L.Rev. 1250, 1251 (1973). Both the House and Senate subcommittees which held hearings on the Williams Act included an identical brief description of a typical tender offer in their reports:

> The offer normally consists of a bid by an individual or group to buy shares of a company usually at a price above the market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met.

S.Rep.No. 550, 90th Cong., 1st Sess. (1967); H.R.Rep.No. 1711, 90th Cong., 2d Sess. (1968), [1968] U.S.Code Cong. & Admin.News at 2811.

While a small number of courts have extended the concept of a tender offer to encompass specified methods of stock acquisition which may exert pressure on shareholders to make uniformed, ill–considered decisions to sell similar to the possible pressures Congress associated with conventional tender offers, *see Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 596–99 (5th Cir. 1974), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *S–G Securi-*ties, *Inc. v. Fuqua Investment Co.*, 466 F.Supp. 1114, 1123 ·27 (D.Mass.1978); *Cattleman's Investment Co. v. Fears*, 343 F.Supp. 1248 (W.D. Okl.1972), *vacated per stipulation*, Civil No. 75 ·152 (W.D.Okl. May 8, 1972), no court has held that unsolicited open market purchases of stock in and of themselves constitute a tender offer. *See Kennecott Copper Corp. v. Curtiss–Wright Corp.*, 584 F.2d 1195, 1205· 07 (2d Cir. 1978); *Brascan Ltd. v. Edper Equities Ltd.*, 477 F.Supp. 773, 789 92 (S.D.N.Y.1979); *Chromalloy American Corp. v. Sun Chemical Corp.*, 474 F.Supp. 1341, 1346·47 (E.D.Mo.1979), *aff'd*, 611 F.2d 240 (8th Cir. 1979); *Calumet Industries v. MacClure*, 464 F.Supp. 19, 29 (N.D.Ill. 1978); *cf. Stromfeld v. Great Atlantic and Pacific Tea Co.*, 484 F.Supp. 1264 (S.D.N.Y.1980); *Wellman v. Dickinson*, 475 F.Supp. 783 (S.D.N.Y.1979). *Cf. also* SEC Release No. 34–16385, 44 Fed.Reg. 70349 (Dec. 6, 1979).

12. *Cf. Chromalloy American Corp. v. Sun Chemical Corp.*, 483 F.Supp. 116, 118 (E.D.Mo. 1980).

13. Coons apparently dealt with the Act's 10% threshold requirement by reference to the "about to engage in a violation" language in Section 10(a), *see* n.4, *supra*, and by viewing appellants' purchases as a single acquisition which would ultimately result in their owning in excess of 10% of Stokely's stock.

Act might well prove irreconcilable.[14] But the relevant point here is that a ruling that the Takeover Act is inapplicable to appellants' activities as a matter of Indiana law would effectively moot their constitutional claims; that very issue is now before both the Indiana Superior Court in the Commissioner's civil action, and the Indiana Court of Appeals pursuant to appellants' administrative appeal.

City and GDV nonetheless advance two reasons why *Pullman* abstention is inappropriate here. First, they argue that the *Pullman* abstention doctrine is a creature of equity which is not properly invoked where there cannot be a speedy and authoritative state court adjudication to protect the federal rights at issue. All of the cases appellants cite in support of that proposition, however, are inapposite. In *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), the Supreme Court held that abstention was inappropriate when raised three years after the litigation had commenced, when no state court proceeding was pending and, most significantly, when the state law claims assertedly requiring abstention were of "barely colorable relevance" to the fourteenth amendment claim at issue. *Id.* at 623, 94 S.Ct. at 1334. By contrast, abstention was argued at the outset of the instant case, two state court proceedings

presently pend and resolution of threshold state law questions could moot the constitutional claims entirely. Similarly, *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), involved state statutes "clear and unambiguous in all material respects," *id.* at 535, 85 S.Ct. at 1182; in *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), the Supreme Court "doubt[ed] . . . that a construction of the oath provisions [by a state court] . . . would avoid or fundamentally alter the constitutional issue raised . . . ," *id.* at 375–76, 84 S.Ct. at 1325, and in *Zbaraz v. Quern*, 572 F.2d 582 (7th Cir. 1978), this court remarked that "it [was] unlikely that a state court construction . . . [would] either moot or materially alter the statutory or constitutional questions raised . . . ," *id.* at 584. Moreover, each of those cases involved state enactments which impinged upon civil rights arguably more fundamental than the right to buy or sell stock.[15]

Appellants maintain that affirmance of the district court's abstention ruling would require them to pursue their state judicial remedy all the way to the Indiana Supreme Court, citing *Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970), and this would cause substantial delay. But the United States Supreme Court was apparently untroubled by that prospect in *Fornaris*, because *abstention was ordered.*[16]

---

**14.** The Williams Act establishes a two–tiered approach to the regulation of large securities purchases. Section 13(d), relating to open market and other non–tender offer purchases, requires only that a purchaser make certain specified disclosures within ten days after his acquisitions have exceeded 5% of the outstanding shares of a security. By contrast, Section 14(d), relating to tender offers, requires that a tender offeror file with the SEC and publish certain information required by the SEC, and comply with a number of additional requirements relating to withdrawal rights, pro rata acceptance of shares and uniformity of purchase price. Congress specifically enacted Section 13(d) in a less burdensome form than Section 14(d) so as not to unduly interfere with the free and open auction market in securities. *See* E. Aranow, H. Einhorn and G. Berlstein, *Developments in Tender Offers for Corporate Control* at 11 (1977). Thus, were the Takeover Act definitively interpreted to reach appellants' transactions here, a cogent argument could be

made that the resultant interference with normal market procedure would be preempted by the Williams Act and would constitute an unjustifiable burden on interstate commerce. *But cf. Telvest, Inc. v. Bradshaw*, 618 F.2d 1029 (4th Cir. 1980).

**15.** For example, *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), involved the right to vote, a right therein described as "Fundamental 'because preservative of all rights.' " *Id.* at 537, 85 S.Ct. at 1183 (citation omitted).

**16.** While it is true that action by this court on appellants' constitutional claims, under our decision today, must await interpretation of the Takeover Act by the Indiana Supreme Court, should the Indiana Court of Appeals or the Superior Court hold the Takeover Act inapplicable to appellants' conduct in the proceedings that pend before them, either of those courts

The crux of appellants' argument thus lies in their contention that settled abstention principles should be disregarded here because the delay occasioned by abstention in favor of assertedly "inadequate" state court proceedings would be "particularly inequitable." But the record here does not point clearly to "inadequacy" in the sense of unwillingness to deal fairly and promptly with the issues. Should subsequent "inadequacy" appear, we would, of course, be required to reappraise our abstention. Further, appellants' contention of "inadequacy" might be more persuasive had they sought equitable relief in this federal action (instituted on June 1, 1979), either exclusively or in conjunction with state remedies, immediately after being notified on June 7 by Commissioner Coons that he would hold an administrative hearing on June 15. Instead they sought only to invoke the equitable powers of the Indiana Superior Court to enjoin the administrative hearing. Exclusive recourse at that juncture to the Indiana forum tends to bely their avowed belief in the inadequacy or dilatoriness of the Indiana courts.

It is true that appellants have now been interdicted from the market in Stokely stock for a substantial period of time, and, more tellingly, Stokely's common shareholders have been deprived of a willing purchaser for their shares, should they be interested in selling. But we are not convinced that this state of affairs is sufficiently exigent or deleterious to warrant action contravening the abstention doctrine. Abstention embodies a strong policy of constitutional adjudication requiring us to refrain from decisionmaking in instances where the need for a constitutional ruling will likely be obviated. *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See* A. Bickel, *The Least Dangerous Branch* at 111–133 (1962).[17]

A second reason why City and GDV insist that *Pullman* abstention is inappropriate here relates to their contention that the state's use of a biased and prejudiced decisionmaker (i. e. Commissioner Coons) to preside over administrative proceedings violated their fourteenth amendment right to due process. Appellants argue that this court must rule on the merits of that claim because the claim would not be resolved by a definitive interpretation of the Takeover Act by the Indiana courts, irrespective of the effect such an interpretation might have on their other constitutional claims.

We agree that construction of the Act by the Indiana courts will not "resolve" appellants' due process claim. But neither will it "resolve" their supremacy or commerce clause challenges. What such a construction might do, by recognizing appellants' conduct as outside the purview of the Act,

---

would be empowered to dissolve Commissioner Coons' cease and desist order, thus permitting appellants to re-enter the market in Stokely stock (at least for a time), even though the Indiana Supreme Court had yet to interpret the Takeover Act definitively.

**17.** We also note that the context of any possible review of the merits of this case now might prove limited by the facial nature of the constitutional challenges which appellants currently choose to press. City and GDV deem their own activities to be restricted solely to unsolicited open market purchases; they vehemently insist that they are not engaged in a tender offer. They have accordingly proceeded under Section 13 of the Williams Act, rather than Section 14. *See* n.14, *supra*. At the same time, while having in the district court initially challenged the Takeover Act's constitutionality both facially and as applied, appellants subsequently abandoned their "as applied" challenge, and now pursue only a facial challenge on this appeal. On its face, however, the Takeover Act does not purport to regulate mere open market purchases, and thus does not *on its face* appear to conflict with *Section 13* of the Williams Act. Of course, Commissioner Coons' *application* of the Takeover Act in this case may well conflict with Section 13, *see* n.14, *supra*, but appellants have dropped their challenge to the Act as applied. Thus, because their present challenge is purely facial, appellants must presumably contest the constitutionality of the Takeover Act solely as against Section 14 of the Williams Act. This is a challenge which, because appellants have not proceeded under Section 14 by making a tender offer, Stokely goes so far as to suggest they do not have standing to maintain. But we are not persuaded by this suggestion. *Cf. Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

is to render a decision on *all three challenges* unnecessary. If the Act is determined to have been incorrectly applied, then there will be no need to reach the due process claim, any more than there will be a need to reach the other constitutional claims.

City and GDV argue that we are obligated to regard *Pullman* as inapplicable because the due process claim is essentially unrelated to the Takeover Act. They maintain that they are challenging Coons' bias and prejudice in adjudicating factual issues which he had assertedly prejudged prior to the administrative hearing he conducted. The district court, however, expressly found that Coons "has held no bias or prejudice against plaintiffs at any time" and "did not prejudge the issues heard by him." We do not believe we are required now to determine whether this essentially factual finding is clearly erroneous.

What appellants ultimately differ with is the Commissioner's interpretation of the Act. The facts that appellants engaged in large–scale open market purchases of Stokely stock and filed a Schedule 13D which was given substantial publicity are undisputed; it is the legal characterization of those facts which is at issue. Appellants' assertion of prejudice and prejudgment thus merges broadly into a very strong disagreement with the Commissioner on whether the Act is applicable to their conduct. "Abstention is appropriate 'in cases presenting a federal constitutional issue which might be mooted *or presented in a different posture* by a state court determination of pertinent state law.'" *Colorado River*

Water Conservation District v. United States, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)) (emphasis supplied). Appellants' due process claim falls well within that rule.

We therefore conclude that the district court's decision to abstain, on *Pullman* grounds, was not an abuse of discretion. *Cf. Louisiana Power and Light Co. v. City of Thibodaux*, 360 U.S. 25, 30, 79 S.Ct. 1070, 1073, 3 L.Ed.2d 1058 (1959). "[W]here an unconstrued state statute is susceptible of a construction by the state judiciary 'which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem', [abstention is required]." *Bellotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976) (quoting *Harrison v. NAACP*, 360 U.S. 167, 177, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959)).[18] Despite the good reasons for it, we approve *Pullman* abstention with considerable reluctance because we remain aware that inordinate delay or administrative arbitrariness may impair substantial rights. But our retention of jurisdiction, discussed below, responds to possible problems of this sort.

The proper course of action when *Pullman* abstention has been ordered is for the federal court to retain jurisdiction pending proceedings in the state courts. *American Trial Lawyers Ass'n, New Jersey Branch v. New Jersey Supreme Court*, 409 U.S. 467, 469, 93 S.Ct. 627, 629, 34 L.Ed.2d

---

**18.** We thus do not have occasion to consider appellees' alternative contention that abstention is also required under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *See* n.9, *supra*.

Appellants additionally argue on this appeal that the district court's refusal to grant them interim equitable relief against enforcement of Commissioner Coons' cease and desist order, once such relief had been requested, was improper. Appellees' arguments to the contrary notwithstanding, the granting of such relief is not barred by the Anti-Injunction Act, 28 U.S.C. § 2283 (1976). Each of appellants' constitutional claims was properly brought pursuant to 42 U.S.C. § 1983 (1976). *See Maine v.*

Thiboutot, — U.S. — , 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Claims brought under Section 1983 come within the "expressly authorized by Act of Congress" exception to the Anti-Injunction Act, 28 U.S.C. § 2283 (1976); *Mitchum v. Foster*, 407 U.S. 225, 228, 92 S.Ct. 2151, 2154, 32 L.Ed.2d 705 (1972).

The grant or denial of equitable relief nevertheless remains a matter committed to the trial court's discretion. *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 565 F.2d 1194 (7th Cir. 1977). In view of our affirmance of the district court's decision to abstain from reaching appellants' constitutional claims, it was not an abuse of discretion for the district court to refuse to grant equitable relief.

651 (1973); *cf. Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 88–89, n.14, 95 S.Ct. 870, 878, n.14, 43 L.Ed.2d 32 (1975). Since the district court has already considered the merits of appellants' constitutional challenges in its alternative holdings (which we do not now reach), this court will retain jurisdiction of this appeal. Appellants may, at their option, pursue their federal constitutional claims in state court, or, should the need for our ruling not have been obviated, they may return to this court for adjudication of their constitutional claims after the relevant issues of Indiana law have been determined by the Indiana courts, or after efforts to obtain such a determination have been exhausted. *See England v. Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).[19] We think the more evident, not to say egregious, problem here is whether Coons could validly act under the Takeover Act.

AFFIRMED.

---

**19.** We are also aware of the possibility, not adverted to by the parties, of certification of questions of Indiana law directly to the Indiana Supreme Court. *See* Ind.Code § 33–2–4–1 (1978); Ind.R.App.P. Rule 15(O). *See also Elkins v. Moreno*, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 1338 (1978); *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).