**PENNWALT CORPORATION**

v.

**CENTAUR PARTNERS, et al.**

**TRIO ACQUISITION CORPORATION, et al.**

v.

**PENNWALT CORPORATION, et al.**

v.

**TRIO ACQUISITION CORPORATION, et al.**

Civ. A. Nos. 88–5146, 88–9422.

United States District Court, E.D. Pennsylvania.

March 10, 1989.

Matthew J. Broderick, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

David H. Pittinsky and Bruce W. Kauffman, Dilworth, Paxson, Kalish & Kauffman, Carl W. Hittinger, Patrick T. Davish, Jeffrey P. Greenbaum and Barbara Shotel, Philadelphia, Pa., Richard P. Swanson, Pro Hac Vice, Leonard P. Gubar, Robert J.A. Zito, Rhonda D. Orin, Lawrence S. Hirsh and Nora J. Tronto, Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, for all defendants.

Barry F. Schwartz, Philadelphia, Pa., for M.L.C. Partners II Ltd., Partnership, Lenny Corp., RER Corp., Leonard Toboroff, Robert Nederlander, Jeffrey Epstein and Jeffrey Steiner.

## OPINION

GAWTHROP, District Judge.

At issue is the validity of a solicitation for a shareholders' meeting, drafted by Centaur Partners and Trio Acquisition Corporation (Centaur) to shareholders of Pennwalt Corporation (Pennwalt). The solicitation states, in pertinent part, that if the person executing it is deemed a member of a "Controlling group" within the meaning of Section 910 of the Pennsylvania Business Corporation Law (PCBL), Pa.Legis. Serv. 160–64 (May, 1988), "this Demand of Meeting shall be null, void, and of no effect." Pennwalt has filed the instant motions for a temporary restraining order and for a preliminary injunction to prevent Centaur from soliciting the call for a meeting, alleging that the solicitation is invalid. In response, Centaur has moved for declaratory relief, requesting that I find, that Section 910 does not to its solicitation apply. Centaur also argues that if Section 910 does affect the solicitation, the section is unconstitutional.

### Background

On January 13, 1989, Centaur commenced a "Solicitation of Demands for a Special Meeting of Shareholders of Pennwalt Corporation." The letter accompanying the solicitation stated that its purpose was solely to seek the shareholder's consent to demand a special meeting "to Remove Certain Impediments to the Acquisition of the Company by [Centaur]." Specifically, the solicitation sought

(1) To consider and vote upon a proposal to remove the Board of Directors of the Company in its entirety;

(2) To consider and vote upon an amendment to the By-laws of the Company to reduce the number of directors of the Company from 11 to five and to eliminate the requirement that directors of the Company also be shareholders; and

(3) To consider and vote upon the nomination and election of new directors of the Company to fill all five vacancies created by the removal of current directors and the reduction of the number of directors, each to hold office until the next annual meeting and until a successor has been elected and qualified.

The letter emphasized that

*IT IS NOT THE PURPOSE OF THIS LETTER TO SOLICIT PROXIES TO VOTE ON THE ISSUE WHICH WOULD BE PRESENTED AT THE SPECIAL MEETING. IF A SPECIAL MEETING IS CALLED, CENTAUR WILL DELIVER TO SHAREHOLDERS A PROXY STATEMENT AND WILL SOLICIT PROXIES WITH RESPECT TO THE ISSUE TO BE VOTED UPON AT THE SPECIAL MEETING. SIGNING THE ENCLOSED DEMAND OF MEETING WILL NOT AFFECT YOUR ABILITY AS A SHAREHOLDER TO*

*VOTE* AGAINST ANY OF THE PROPOSALS PRESENTED AT THE SPECIAL MEETING AND DOES NOT CONFER ON CENTAUR ANY RIGHT TO VOTE ANY OF YOUR SHARES AT THE MEETING.

(Emphasis supplied).

On January 21, 1989, Centaur supplemented its solicitation to include the following provision:

> The Demand of Meeting is being executed on the assumption that the person executing this Demand of Meeting would not, by such execution, become a member of a "Controlling group" including Centaur and Trio within the meaning of Section 910 of the Pennsylvania Business Corporation Law. *In the event a court of competent jurisdiction finally determines that the person executing this Demand of Meeting would be deemed a member of such "controlling group" by such execution, the execution of this Demand of Meeting shall be null, void and of no effect as of the time of such execution.*

(Emphasis supplied).

It is the final sentence (the "proviso") that gives rise to the instant dispute between the parties. Pennwalt contends that Centaur and the signing shareholders would constitute a "controlling group" for purposes of Section 910, and, that consequently, the "null, void, and of no effect" provision of the proviso is met. Centaur replies that Section 910 does not apply to the solicitation, but adds that if the section were construed to apply to its actions, the section would be unconstitutional under the Supremacy Clause.

### *Discussion*

To obtain a temporary restraining order in a tender offer, the party seeking such relief must show (1) a reasonable probability of eventual success on the merits; (2) irreparable harm if the injunction does not issue; (3) the possibility of harm to other interested persons; and (4) that the granting of injunctive relief is in the public interest. *See: Polaroid Corp. v. Disney,* 862 F.2d 987, 991 (3d Cir.1988).

### I. The Abstention Doctrine

Pennwalt first contends that this court should abstain from deciding the Section 910 issue, on the basis of the abstention doctrine. "[A]bstention is the exception, not the rule, and is justified only in the exceptional circumstance where the order guiding the parties to the state court 'would clearly serve an important state interest.'" *Izzo v. Borough of River Edge,* 843 F.2d 765, 767 (3d Cir.1988), *quoting Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

### A. The Pullman Abstention Doctrine

The *Pullman* doctrine derives from *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Under that doctrine, federal courts should abstain from deciding cases, where "an unconstrued state statute is susceptible of a construction by the state judiciary 'which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.'" *Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976), *quoting Harrison v. NAACP,* 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959). In *Kennecott Corp. v. Smith,* 637 F.2d 181, 184–85 (1980), the Third Circuit stated:

> The type of state question that usually triggers *Pullman* abstention is presented when "the unsettled issue of state law principally concern[s] the applicability of the challenged [state] statute to a certain person or a defined course of conduct, whose resolution in a particular matter would eliminate the constitutional issue and terminate the litigation." (Citations and emphasis omitted).

As an example of a "classic situation for *Pullman* abstention" the Third Circuit pointed to *City Investing Co. v. Simcox,* 633 F.2d 56 (7th Cir.1980). In that case, the Seventh Circuit applied the *Pullman* doctrine to a "newly enacted and yet to be construed" Indiana Takeover Act, purporting to regulate "takeover offers."

At first blush, *Simcox* would appear to apply to the case at bar. Both cases concern newly enacted statutes which had yet to be construed by the state courts. Close analysis of *Simcox*, however, reveals that, crucial to the Seventh Circuit's analysis, was the high improbability that the statute would apply. The Takeover Act there concerned only acquisitions of ten per cent or more of any class of the outstanding equity securities of the target company. By contrast, plaintiffs, City Investing Co. and GDV, Inc., had purchased only five per cent of the defendant Stokely–Van Camp, Inc.'s stock. Furthermore, that statute expressly exempted ordinary broker-dealer transactions of the type engaged in by GDV, Inc. On these facts, the Seventh Circuit declared that

> the case before us falls within "the paradigm of special circumstances" that makes *Pullman* abstention appropriate, for there is a *substantial likelihood that the Indiana courts will determine that the Takeover Act ... is inapplicable to ... [plaintiffs'] activities.*

633 F.2d at 60 (emphasis supplied). Unlike *Simcox*, there exists no "substantial likelihood" that Pennsylvania courts will determine Section 910 inapplicable to the case at bar. The issue turns upon surrounding facts, and it is plain from a reading of the statute that the provision applies. Although the section, at first reading, is something of a tangled statutory skein, it is, once parsed and unravelled, clear on its face. Because the challenged provision is unambiguous, the *Pullman* doctrine does not here apply. *Kennecott Corp. v. Smith*, 637 F.2d at 185.

## II. The Burford Abstention Doctrine

■ Pennwalt next contends that this court should abstain under the doctrine enunciated in the case of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The *Burford* doctrine "stands for the proposition that where a state creates a complex regulatory scheme, supervised by the state courts and central

to state interests, abstention will be appropriate if federal jurisdiction deals primarily with state law issues and will disrupt a state's efforts to 'establish a coherent policy with respect to a matter of substantial public concern.'" *Lac D'Amiante du Quebec v. American Home Assur.*, 864 F.2d 1033, 1043 (3d Cir.1988), *quoting Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1245. "[T]he presence of a federal basis for jurisdiction may raise the level of justification needed for abstention [under the *Burford* doctrine]." *Colorado River*, 424 U.S. at 815, 96 S.Ct. at 1245.

Section 910 is but one provision of a group of amendments to the PCBL, designed to give rights to minority shareholders. It neither provides for a complex regulatory scheme, nor broaches issues requiring special expertise. As the Third Circuit aptly noted in *Izzo v. Borough of River Edge*: "The issue here is not so technical that it requires the district court to become meshed in a highly specialized area inconsistent with resolution of a relatively minor federal concern. Nor will the federal court's decision have a potentially far reaching effect in the area [in question]...." 843 F.2d at 769. Furthermore, considering the limited scope of the Section 910, I am convinced that federal court intervention will not seriously disrupt the Commonwealth's establishment of its own policies. *See: Aetna Casualty & Surety Co. v. Sterner*, 700 F.Supp. 252, 254 (E.D. Pa.1988), and cases cited therein.

Accordingly, I decline to abstain under either the *Pullman* or *Burford* doctrines.[1]

## III. The Probability of Success on the Merits

### A. Section 910

■ By its terms, Section 910 empowers shareholders to receive payment for their shares following a "control transaction." The statute defines a "control transaction" as "the acquisition by a person or group of the status of a controlling person or

---

1. Pennwalt has not argued that the Younger abstention doctrine applies. *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (abstention proper where pending state criminal proceeding).

group." § 910(B)(4). "A controlling person or group" is, in turn, defined as "a person who has, or a group of persons acting in concert that has, voting power over voting shares of the corporation that would entitle the holders thereof to cast at least twenty per cent of the votes that all shareholders would be entitled to cast in an election of directors of the corporation." § 910(B)(1).

Pennwalt contends that Centaur and the other shareholders who together are entitled to cast over 20% of the vote of all shareholders, and who joined together to demand a meeting to effect a control transaction, formed a "controlling person or group" for purposes of Section 910. I agree. If a special meeting of shareholders were called, Centaur and the shareholders would have "voting power over voting shares of the corporation," entitling them "to cast at least twenty per cent of the votes that all shareholders would be entitled to cast in an election of directors of the corporation." *See:* § 910(B)(1).

Furthermore, I find that Centaur and the shareholders have been acting "in concert." According to Black's Law Dictionary, "[a] person is deemed to act in concert when he acts with another to bring about some preconceived result." The Oxford American Dictionary defines "concert" as "agreement, cooperation," "in concert" as "in combination, together." The shareholders' attorneys have, throughout the hearings on Pennwalt's motions for preliminary injunctions, been represented by counsel working in tandem, speaking in one, unison voice. Their views, as voiced to the court, invariably have coincided with Centaur's. For me to conclude that the shareholders before this court have not been working in concert would require me to play the judicial ostrich. More important, the language of the invitational letters of transmittal of the demand form speaks of a common purpose, of agreement, or cooperation, to together bring about a preconceived result, i.e. the removal of Pennwalt's board of directors. As Judge Ballantine, of the Western District of Kentucky, noted in similar circumstances:

We have little difficulty concluding from the evidence presented at the hearing that there is a substantial likelihood that plaintiffs could prevail on their allegations that the defendants have formed a group at least for the purpose of calling a special stockholders meeting and voting their shares together in an attempt to remove various members of the current Board of Directors of Bancorp. It would require a degree of naivete unbecoming this Court to believe that the various activities of defendants were not the product of an agreement among the group but, rather, were merely coincidences.

*Citizens First Bancorp, Inc. v. Harreld,* 559 F.Supp. 867, 872 (W.D.Ky.1982).

1. The purported proxy exception to Section 910.

Centaur replies, first, that the section is not applicable to its solicitation, because Section 910 does not apply to proxies. In support of its argument, Centaur points to comments of Senator Fisher, one of the prime sponsors of the legislation, who stated that "it is my interpretation and the interpretation of others that this bill, particularly Section 910, would not affect proxy fights." Pa.Legis.Journal—Senate, General Assembly of 1983 at 1433 (December 6, 1983). But "[r]eliance on legislative debate in interpreting the intent or meaning of a statute is contrary to Pennsylvania law, *see Commonwealth v. Alcoa Properties, Inc.,* 440 Pa. 42, 269 A.2d 748 (1970), and therefore the remarks of individual legislators cannot be binding as to legislative intent." *Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Comm'n,* 837 F.2d 600, 616 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988).

Holding Centaur to its own choice of language, I find the words "IT IS NOT THE PURPOSE OF THIS LETTER TO SOLICIT PROXIES...." to mean what it says: that the solicitation is not in fact a proxy solicitation. It may be a procedural preamble to a proxy solicitation, but a proxy solicitation it is not. Accordingly, Centaur's argument is without merit.

2. The "agent" exception to Section 910.

Centaur next argues that the relationship created between the soliciting party, Centaur, and the shareholders signing the solicitation is one of agency, thereby bringing it within the exception to Section 910, set out in Section 910 B(3)(i), which provides:

A person shall not be a controlling person under [Section 910 B(1)] *if such person holds voting power*, in good faith and not for the purpose of circumventing this section, *as an agent, . . .* for one or more beneficial owners who do not individually or, if they are a group acting in concert, as a group have the voting power specified in [Section 910 B(1)] or who are not deemed a controlling person or group under [Section 910 B(2)]. (Emphasis added).

Section 910 B(3)(ii) defines "voting power" as follows:

For purposes of this section, a person has voting power over a voting share if such person has or shares, directly or indirectly, through any option, contract, arrangement, understanding, conversion right or relationship, or by acting jointly or in concert or otherwise, *the power to vote, or to direct the voting of, such voting share.* (Emphasis supplied).

Assuming, however, that the capitalized language of Centaur's solicitation letter ("SIGNING THE ENCLOSED DEMAND OF MEETING WILL NOT AFFECT YOUR ABILITY AS A SHAREHOLDER TO VOTE AGAINST ANY OF THE PROPOSALS. . . .") means what it says, Centaur does not hold voting power, within the meaning of the statute, for the other shareholders.

### B. The Constitutional Challenge to Section 910

In the alternative, Centaur contends that if Section 910 applies, it is unconstitutional,

as violative of the Supremacy Clause. Specifically, Centaur argues that Section 910 conflicts with Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)[2], in that it impermissibly burdens a stockholder's absolute right to vote and infringes the rights of dissenting shareholders, such as Centaur, to challenge corporate management.

In *Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas,* —— U.S. ——, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989), the United States Supreme Court pertinently stated:

Congress has the power under the Supremacy Clause of Article IV of the Constitution to pre-empt state law. Determining whether it has exercised this power requires that we examine congressional intent. In the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law, *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 [67 S.Ct. 1146, 91 L.Ed. 1447] (1947), or where the state law at issue conflicts with federal law, either because it is impossible to comply with both, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248] (1963), or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives, *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941).

—— U.S. at ——, 109 S.Ct. at 1273.

In *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970), the Supreme Court described the purpose behind Section 14(a) as follows:

2. Section 14(a) provides:
It shall be unlawful for any person, by the use of mails or by any means or instrumentality of interstate commerce or of any facility of national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary

or appropriate to the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section [12] of this title.

[Section 14(a) ] stemmed from a congressional belief that "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange." ... The provision was intended to promote "the free exercise of the voting rights of stockholders" by ensuring that proxies would be solicited with "explanations to the stockholders of the real nature of the questions for which authority to cast his vote is sought." (Citations omitted).

Centaur first contends that if Section 910 were to be construed to apply to the solicitation, it would run afoul of the federal policy contained in Section 14, because it would deter proxy solicitations.

Although Centaur does not hold its solicitation out as being a proxy, it argues, nevertheless, that Section 14(a) and proxy rules promulgated by the Securities Exchange Commission broadly interpret the word to include such solicitations. *See, e.g., Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 795–96 (2d Cir.1985) (proxy rules apply to communications "reasonably calculated" to influence shareholder's votes); *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 796 (8th Cir.1967) (Congress intended to cover entire field of solicitation for corporate control); *Canadian Javelin Ltd. v. Brooks*, 462 F.Supp. 190, 194, n. 2 (S.D.N.Y.1978). These cases are inapposite, in that Section 910 does not govern the solicitation of proxies. The Achilles heel in Centaur's attempt to call a shareholder's meeting is not Section 910, but the language which it chose to include in its solicitation, which causes its demand to self-destruct once the section is triggered. The cases are also distinguishable in that they attempt to enlarge shareholder's protections under Section 14(a), rather than opening wide the opportunities for takeover attempts.[3]

Centaur's very language states that it is not seeking a proxy solicitation, but a special meeting of shareholders. It has no special right to call a shareholders' meeting. Indeed, many states do not provide any right to shareholders to call a special meeting. *See, e.g.,* Del Code Ann. tit. 8, § 211(d), N.Y.Bus.Corp.Law § 602(c); Mo. Ann.Stat. § 351.225(3); Kan.Stat.Ann. § 17–6501(d); Okla.Stat.Ann. tit. 18 § 1056(D). Pennsylvania shall soon join this group as of October, 1989. Under Senate Bill No. 1200, Session of 1987, § 1755(B), which will then take effect, special meetings of shareholders of a public company may be called only by the Board of Directors or by such officers or other persons as may be provided by the bylaws. The right to a hold a special meeting is not equivalent to the right of the shareholders to vote.

Because Section 910 neither conflicts with federal law, nor creates an obstacle to the purposes behind Section 14(a) of the Securities Exchange Act of 1934, the Supremacy Clause is not availing to Centaur. Section 910 does apply to the solicitation, and hence the solicitation, by its own terms, is invalid.

IV. Irreparable Harm, the Possibility of Harm to Other Interested Persons, and the Public Interest

It is beyond cavil that to permit the shareholders' meeting to go forward when there is no proper authority to call the meeting would cause irreparable harm, since the meeting would be null and void. *See: Young v. Janas*, 34 Del.Ch. 287, 103 A.2d 299 (1954) (when call of meeting was invalid, actions taken were a nullity); *In re African Methodist Episcopal Church of the City of Philadelphia*, 85 Pa.D & C. 32, 38 (1953) (special meeting called by person lacking authority was illegal). Because the calling of a public meeting under such circumstances would be legal nullity, the issuance of an injunction to prevent such meeting would not harm third parties, who could not, in any case, benefit from the illegal meeting, and such an injunction would be in the public interest. According-

---

**3.** It is a familiar maxim that the reach of remedial statutes is to be broadly interpreted, whilst its exceptions are to be narrowly construed. *See, e.g., Commonwealth v. Monumental Proper-* ties, Inc., 459 Pa. 450, 461, 329 A.2d 812, 817 (1974) (applying Pennsylvania rules of statutory construction).

ly, I hold that Pennwalt is entitled to a preliminary injunction.

An order follows.

## ORDER

AND NOW, this 10th day of March, 1989, having considered the papers filed by the parties and having heard argument on Pennwalt's motions for a temporary restraining order and a preliminary injunction and Centaur's request for a declaratory judgment, it is hereby ORDERED and DECLARED that the conditional demands submitted to Pennwalt on January 31, 1989, are invalid and that a special meeting of shareholders shall not be called pursuant to the invalid demands. The injunction shall take effect upon the posting of a bond in the amount of $250,000 in cash or the secured equivalent.